[No. G020323. Fourth Dist., Div. Three. May 20, 2004.]

TEXTRON FINANCIAL CORPORATION, Plaintiff and Appellant, v. NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, Defendant and Appellant.

1062

## Counsel

Horvitz & Levy, Mitchell C. Tilner, Peter Abrahams; Lewis D'Amato, Brisbois & Bisgaard, R. Gaylord Smith and Michael W. Connally for Defendant and Appellant.

Stephan, Oringher, Richman & Theodora and Robert M. Dato for Plaintiff and Appellant.

## Opinion

**RYLAARSDAM, J.**—This is our third review of the present case. Plaintiff Textron Financial Corporation sued defendant National Union Fire Insurance Company of Pittsburgh, Pennsylvania and others for breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud arising from defendant's refusal to honor a claim for insurance benefits concerning property damage to a commercial bus in which plaintiff held a security interest. The jury returned a verdict awarding plaintiff $165,414.40 in compensatory damages and $10 million in punitive damages, but in postjudgment proceedings the trial court remitted the latter award to $1.7 million.

Both plaintiff and defendant appealed. In a January 2001 unpublished opinion, we affirmed the judgment and postjudgment orders in their entirety. Our first opinion rejected plaintiff's attacks on a pretrial order striking a cause of action for unfair business practices, the portion of the judgment in favor of defendant's claims adjuster, the amount of compensatory damages awarded on the insurance bad faith claim, plus the postjudgment orders awarding costs to the claims adjuster and denying its request for expert witness fees. We also rejected defendant's attack on the trial court's refusal to offset the sums plaintiff received in pretrial settlements, and both parties' objections to the punitive damage award.

The United States Supreme Court granted defendant's petition for a writ of certiorari, vacated our judgment, and remanded the case to us for further consideration in light of *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) 532 U.S. 424 [149 L.Ed.2d 674, 121 S.Ct. 1678]. After reviewing the matter in accordance with the United States Supreme Court's direction,

we issued a second opinion in June 2002, again affirming the judgment and postjudgment orders in their entirety. Defendant again petitioned the United States Supreme Court for a writ of certiorari. The Supreme Court granted the petition, vacated our second opinion, and remanded the case to this court for further consideration in light of *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408 [155 L.Ed.2d 585, 123 S.Ct. 1513].

Except for the issues raised concerning the punitive damage award, we again affirm the trial court's rulings and judgment. For the reasons expressed below, we now conclude, based on the facts of this case, that plaintiff's recovery of punitive damages, in relation to the amount of compensatory damages awarded on the insurance bad faith and fraud claims and the nature of those damages, must be reduced. Consequently, we shall reverse the order remitting the amount of punitive damages and modify the judgment to award plaintiff punitive damages of $360,000.

## FACTS

Il Sung Ko operated a tour bus company, Taeguk Tour and Sightseeing (Taeguk). Plaintiff loaned Ko funds to purchase a bus, receiving in return a security interest in the vehicle. The security agreement required Ko to insure the bus. Ko obtained a National Union liability insurance policy through D.W. Ferguson & Associates, Inc. (Ferguson), an independent insurance brokerage. The policy was issued through TRM International, Inc. (TRM), a company appointed by defendant to solicit, bind, write, and administer policies for its commercial bus program. The policy listed plaintiff as a loss payee and required defendant to mail plaintiff notice in advance if it cancelled the policy.

Taeguk suffered a downturn in business and Ko failed to timely pay his insurance premiums. In October 1992, TRM sent Ko notice it intended to cancel the policy. TRM did not send a copy of the cancellation notice to plaintiff. The policy terminated November 27.

Beginning in late October and throughout November, Ferguson and Taeguk discussed reducing the insurance premiums by deleting coverage for some of Ko's vehicles. Ferguson also corresponded with a TRM underwriter about the situation, proposing the issuance of a new policy covering only some of Ko's busses. The underwriter suggested an alternative whereby TRM would reinstate the original policy and give Ko a credit against his policy's premium if he agreed to certain conditions, which included delivering the license plates of two buses to Ferguson and temporarily suspending use of those vehicles. Plaintiff presented expert testimony that, unlike a transaction where a vehicle is deleted from a policy, the alternative approach implemented a procedure

described as lay-up credit. Under a lay-up credit, the insured maintains coverage on a vehicle while it is not being operated.

Ko agreed to this proposal, and on December 1, TRM retroactively reinstated the policy effective November 27. The bus encumbered by plaintiff's security interest was one of the vehicles Ko intended not to use. Plaintiff did not receive notice of the policy reinstatement with the endorsement that reflected Ko's business received a premium credit due to the vehicle's nonuse. National Union claimed it sent a copy of this endorsement to plaintiff, but plaintiff denied receiving it.

In January 1993, the bus encumbered by plaintiff's lien suffered extensive damage when it collided with another vehicle on a public highway. At Taeguk's request, Ferguson submitted a notice of claim to defendant's claims adjuster, American International Adjustment Company, Inc. (AIAC). On February 4, TRM sent AIAC a notice verifying coverage for the vehicle and confirming plaintiff as a loss payee. However, after further correspondence with Taeguk and TRM, AIAC denied the claim, asserting the bus had been deleted from the policy before the accident. TRM prepared an endorsement deleting the bus from the policy (Number 8) on February 16. This endorsement purported to be effective as of December 1, 1992.

In late 1993, Ko defaulted on plaintiff's loan. Plaintiff then learned about the accident and contacted Ferguson concerning insurance benefits to repair the vehicle. Ferguson informed plaintiff the bus had been removed from the policy before the accident. Plaintiff sued Ko, recovering a judgment against him and incurring $3,859.50 in legal fees in the process. However, Ko filed bankruptcy and discharged the debt.

Plaintiff submitted a claim to defendant for benefits under the insurance policy. At that time, it possessed only a certificate of insurance, not a copy of the policy.

AIAC also handled plaintiff's claim. TRM informed AIAC the encumbered bus had been deleted from the policy before the accident and sent it a copy of endorsement Number 8. A certificate of mailing on that copy covered the part of the endorsement reflecting the date TRM had prepared it. After an AIAC claims manager discussed the matter with John Lavin, a senior underwriter with the division handling defendant's bus program, and Tom Spangenberg, TRM's president, AIAC advised plaintiff the claim was being denied. The basis of the denial was that Ko deleted the bus from the policy before the accident, and TRM and AIAC concluded defendant's policy did not obligate it to give plaintiff advance notice of the deletion. Defendant did not send plaintiff a copy of the policy until August 1994. Again, the mailing certificate covered the portion of endorsement Number 8 displaying the date on which it had been prepared.

## PROCEDURAL BACKGROUND

The trial's first phase dealt with plaintiff's breach of contract cause of action against defendant. The court found, as a matter of law, the insurance contract's loss-payable clause constituted a separate agreement between plaintiff and defendant, obligating defendant to provide 30 days' notice of the policy's cancellation or the bus's deletion from it, and that defendant failed to comply with this requirement. The jury subsequently awarded plaintiff $61,513.80 under the policy.

The second phase involved plaintiff's claims for bad faith against defendant and fraud against both defendant and AIAC. The jury returned a special verdict finding defendant violated the policy's implied covenant of good faith and fair dealing and that it acted with oppression, malice, and fraud in doing so. The jury also returned a special verdict finding defendant liable for intentional misrepresentation and concealment and awarded plaintiff $3,859.80 in damages. Based on its interpretation of the jury's answers in the special verdict, the trial court entered judgment for AIAC on the fraud count.

During this phase, the trial court also ruled plaintiff could recover $30,268.16 in attorney fees as damages under *Brandt v. Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796]. The parties stipulated plaintiff was entitled to $55,616.34 in costs pursuant to *Brandt*. Subsequently, the court denied defendant's request to offset the pretrial settlements plaintiff received from Ferguson ($26,500) and TRM ($62,500) against the compensatory award imposed on it.

The trial's third phase dealt with punitive damages. The jury awarded $10 million in punitive damages against defendant which the trial court subsequently reduced to $1.7 million. In addition, the judgment awarded plaintiff compensatory damages, consisting of the policy benefits plus interest, the legal expenses recoverable under *Brandt v. Superior Court, supra,* 37 Cal.3d 813, and the damages for fraud. Finally, the court awarded AIAC $10,277.52 in costs against plaintiff.

## DISCUSSION

### *PLAINTIFF'S APPEAL*

*Demurrer to the Unfair Business Practices Cause of Action*

The complaint's fourth count sought injunctive and restitutionary relief under Business and Professions Code section 17200 et seq. against defendant and AIAC for "engag[ing] in unfair competition" in the "handling [of

plaintiff's] claim, and the claims of other persons." Plaintiff alleged defendant, "aided and abetted" by AIAC, "used misleading documents to falsely suggest that it would provide insurance . . . where it had no intention to do so," "falsely suggested that it would . . . provid[e] timely notice of [policy] cancellations," "misrepresented the terms and meaning of its policies . . . to provide a pretext for its refusal to provide timely notice," and "engaged in a pattern and practice of wrongful and false cancellations of insurance policies . . . ."

Relying on *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287 [250 Cal.Rptr. 116, 758 P.2d 58], defendant and AIAC generally demurred to this count. The trial court sustained the demurrers without leave to amend. Citing *State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal.App.4th 1093 [53 Cal.Rptr.2d 229], plaintiff contends the trial court's ruling was erroneous.

■ *Moradi-Shalal* held the Unfair Insurance Practices Act (Ins. Code, § 790 et seq.; UIPA) does not create a private cause of action against insurers who violate its provisions. (*Moradi-Shalal v. Fireman's Fund Ins. Companies, supra,* 46 Cal.3d at pp. 304–305.) This rule applies to both first party and third party claims. (*Maler v. Superior Court* (1990) 220 Cal.App.3d 1592, 1597–1598 [270 Cal.Rptr. 222]; *Zephyr Park v. Superior Court* (1989) 213 Cal.App.3d 833, 836–838 [262 Cal.Rptr. 106].) While insurance companies are subject to California laws generally applicable to other businesses, including laws governing unfair business practices (Ins. Code, § 1861.03, subd. (a)), parties cannot plead around *Moradi-Shalal*'s holding by merely relabeling their cause of action as one for unfair competition. (*Manufacturers Life Ins. Co. v. Superior Court* (1995) 10 Cal.4th 257, 283–284 [41 Cal.Rptr.2d 220, 895 P.2d 56]; *Maler v. Superior Court, supra,* 220 Cal.App.3d at p. 1598; *Safeco Ins. Co. v. Superior Court* (1990) 216 Cal.App.3d 1491, 1494 [265 Cal.Rptr. 585].)

■ The specific allegations of wrongful conduct contained in plaintiff's fourth cause of action, using misleading documents and misrepresenting both the terms of the insurance policies and its obligations under them for its own benefit, are the type of activities covered by the UIPA. (Ins. Code, § 790.03, subds. (a) & (h).) In *Safeco Ins. Co. v. Superior Court, supra,* 216 Cal.App.3d 1491, the court ordered dismissal of an action which included a request for injunctive relief under Business and Professions Code section 17200 et seq. based on an insurer's allegedly unfair claims settlement practices. (216 Cal.App.3d at pp. 1493–1494.) "Though the issue is one of first impression, we have no difficulty in deciding the Business and Professions Code provides no toehold for scaling the barrier of *Moradi-Shalal* . . . . To permit plaintiff to maintain this action would render *Moradi-Shalal* meaningless." (*Id.* at p. 1494.) Under the foregoing cases, merely alleging these purported acts

constitute unfair business practices under the unfair competition law is insufficient to overcome *Moradi-Shalal.*

In a few cases, the Supreme Court has allowed an action against an insurance company under the unfair competition law where the alleged conduct constituted an unlawful restraint on trade under the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.), even though it also violated the UIPA. (*Quelimane Co. v. Stewart Title Guarantee Co.* (1998) 19 Cal.4th 26, 43–44 [77 Cal.Rptr.2d 709, 960 P.2d 513]; *Manufacturers Life Ins. Co. v. Superior Court, supra,* 10 Cal.4th at pp. 283–284.) "This conclusion does not compromise the rule of *Moradi-Shalal* in any way. The court concluded there that the Legislature did not intend to create new causes of action when it described unlawful insurance business practices in section 790.03, and therefore that section did not create a private cause of action under the UIPA. The court did not hold that by identifying practices that are unlawful in the insurance industry, practices that violate the Cartwright Act, the Legislature intended to bar Cartwright Act causes of action based on those practices." (*Manufacturers Life Ins. Co. v. Superior Court, supra,* 10 Cal.4th at p. 284.)

The case on which plaintiff relies, *State Farm Fire & Casualty Co. v. Superior Court, supra,* 45 Cal.App.4th 1093, held the plaintiff-insureds had sufficiently alleged a cause of action against their insurer under the unfair competition law based on allegations of conduct constituting common law fraud and breach of the implied covenant of good faith and fair dealing, even though the same conduct violated the UIPA. "While *Moradi-Shalal* clearly held that the Legislature did not intend to create new causes of action when it enacted section 790.03, it is also clear that the Legislature did not intend in any way to circumscribe the previously existing common law right of an insured to seek redress for an insurer's fraudulent deception or breach of the covenant of good faith implied in the policy. . . . Thus, . . . common law claims remain as a firm legal basis on which an insured may rely to seek redress against an insurer." (*State Farm Fire & Casualty,* at pp. 1107–1108.)

The persuasiveness of *State Farm Fire & Casualty* has been undercut by the Supreme Court's subsequent disapproval of its definition of "unfair" business practices. Quoting from *People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509 [206 Cal.Rptr. 164], *State Farm* declared: "The test of whether a business practice is unfair 'involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . . [Citations.]' . . . . [A]n 'unfair' business practice occurs when that practice 'offends an established public policy or

when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.' [Citation.]" (*State Farm Fire & Casualty Co. v. Superior Court, supra,* 45 Cal.App.4th at pp. 1103–1104, fn. omitted.)

But *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163 [83 Cal.Rptr.2d 548, 973 P.2d 527] found this definition is "too amorphous and provid[es] too little guidance to courts and businesses." (*Id.* at p. 185.) While *Cel-Tech Communications* limited its discussion to the context of an action between competitors, the court concluded that, "any finding of unfairness to competitors under section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition," and that under Business and Professions Code section 17200, "the word 'unfair' . . . means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law . . . ." (*Cel-Tech Communications* at pp. 186–187, fn. omitted; see also *Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144, 1165–1167 [93 Cal.Rptr.2d 439] [applying *Cel-Tech Communications*'s standard in vehicle lessee's action against rental agency for allegedly concealing or obscuring the rental agreement's fuel service charge].)

Harmonizing *Moradi-Shalal*'s holding with the foregoing decisions supports a conclusion the trial court properly sustained the demurrers to plaintiff's unfair competition claim. First, the holding in *Safeco Ins. Co. v. Superior Court, supra,* 216 Cal.App.3d 1491, supports this result. Second, this case is distinguishable from *Quelimane* and *Manufacturers Life* in two respects. Neither decision involved an action by an insured or a third party based on the insurer's alleged failure to comply with a policy or to provide benefits. In *Quelimane*, parties who acquired real estate at tax sales sued title insurance companies for refusing to issue policies on their property. *Manufacturers Life* concerned an insurance agency's action against insurance companies for boycotting the agency. Also, in both cases the plaintiff alleged a Cartwright Act violation as the basis for its unfair competition cause of action. Finally, given the Supreme Court's disapproval of *State Farm*'s "amorphous" definition of "unfair" practices and its focus on legislatively declared public policy, reliance on general common law principles to support a cause of action for unfair competition is unavailing.

Under these circumstances, the trial court properly found plaintiff failed to state a cause of action against defendant and AIAC for unfair business practices.

*The Jury's Phase Two Findings*

During the second phase, the jury returned a special verdict containing findings on the elements of two theories of deceit, intentional misrepresentation and concealment of a material fact. The jury's responses reflect it found both defendant and AIAC made representations of a material fact on which plaintiff justifiably relied to its injury and that both defendants made the representations "recklessly without knowing whether [they were] true or false." However, the jury concluded AIAC did not know the representations were false and did not make them with the intent to defraud plaintiff. On the concealment theory, the jury found both defendants concealed or suppressed a material fact which resulted in injury to plaintiff, but also found AIAC did not intentionally conceal or suppress a material fact with the intent to defraud plaintiff. In addition, the jury concluded both defendants were "guilty of fraud, malice, or oppression in the conduct upon which [it] based [its] finding of liability . . . ."

When the jury returned its special verdict, the court discussed the inconsistency in the findings with counsel and ultimately ruled AIAC "is not liable for fraud or concealment." Plaintiff argues the trial court erred by construing the jury's findings to exonerate AIAC.

The distinction between a general and special verdict is that under the former a jury "pronounce[s] generally upon all or any of the issues," while the latter is one "by which the jury find the facts only, leaving the judgment to the court." (Code Civ. Proc., § 624.) In a case "[w]here a special finding of facts is inconsistent with the general verdict, the former controls the latter, and the court must give judgment accordingly." (Code Civ. Proc., § 625; see also *Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1156–1157 [17 Cal.Rptr.2d 608, 847 P.2d 574]; *Bond v. DeWitt* (1954) 126 Cal.App.2d 540, 544 [272 P.2d 561].)

The jury's findings that AIAC made representations recklessly but without knowing the statements were false are inherently inconsistent. A representation made recklessly without knowledge of its falsity is sufficient to establish scienter. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 705, p. 806.) However, on both fraud theories the jury found AIAC did not act with an intent to defraud plaintiff. An intent to induce reliance on a misrepresentation or nondisclosure by the plaintiff is essential to establish liability for either an intentional misrepresentation or concealment of a material fact. (*Lovejoy v. AT&T Corp.* (2001) 92 Cal.App.4th 85, 93 [111 Cal.Rptr.2d 711]; *Conrad v. Bank of America* (1996) 45 Cal.App.4th 133, 157 [53 Cal.Rptr.2d 336]; 5 Witkin, Summary of Cal. Law, *supra,* §§ 706, 710, pp. 807, 810.) The absence of this element defeats plaintiff's fraud claim against AIAC. Furthermore, the finding relevant to defendants' punitive

damages liability was in the nature of a general verdict and is subordinate to the jury's specific finding of no intent to defraud. Thus, the trial court properly entered judgment for AIAC on the fraud claim.

Plaintiff contends AIAC could be found liable either as a coconspirator of defendant or on a theory of negligent misrepresentation. These contentions lack merit.

First, since plaintiff did not assert the latter theory at trial, and the court did not instruct the jury on it, it is now too late to do so. (*Overgaard v. Johnson* (1977) 68 Cal.App.3d 821, 826 [137 Cal.Rptr. 412].) Second, while the court did instruct the jury on conspiracy as a basis for imposing liability, as plaintiff concedes, the jury was not asked to return a special verdict on this allegation. Had the jury concluded AIAC was liable as a coconspirator with defendant, it should have returned a finding of an intent to defraud.

A review of plaintiff's closing argument also reflects it relied on the representations and conduct of AIAC's employees, not conspiracy, to support its fraud claim. In fact, while discussing the question of whether defendant acted with malice, plaintiff's counsel suggested no conspiracy existed. "An insurance company whose job is to . . . investigate the situation thoroughly, concealing information which it knows is going to lead to a discovery that there's coverage—even concealing that information from its own claims people so that they won't have a guilty conscience about denying the claim—that's malice."

The trial court properly entered judgment for AIAC on the fraud claim.

*The Brandt Damage Award*

Plaintiff retained legal counsel under an agreement requiring it to pay counsel 40 percent of all amounts recovered in the case. After a lengthy discussion, the trial court limited the sum plaintiff could recover as damages under *Brandt v. Superior Court, supra,* 37 Cal.3d 813, to 40 percent of the amount recovered as policy benefits during the trial's first phase. Plaintiff attacks this ruling and claims it should have been allowed to recover the reasonable value of counsel's services which it calculates is nearly $300,000 greater than the amount awarded by trial court. This contention lacks merit.

 *Brandt* held attorney fees reasonably incurred to compel payment of policy benefits tortiously withheld by an insurer are recoverable as an element of damages. (*Brandt v. Superior Court, supra,* 37 Cal.3d at pp. 815, 817.) "When an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the

insurer should be liable in a tort action for that expense. The attorney's fees are an economic loss—damages—proximately caused by the tort. [Citation.]" (*Id.* at p. 817.)

The retainer agreement required plaintiff to pay counsel 40 percent of all sums recovered in this action. It had no further legal obligation to pay counsel for the legal services rendered to it. *Brandt* held the "fees recoverable . . . may not exceed the amount attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract." (*Brandt v. Superior Court, supra,* 37 Cal.3d at p. 819.) Plaintiff cites no authority permitting a posttrial modification of the retainer agreement. The trial court did not err by limiting the damage award under *Brandt v. Superior Court, supra,* 37 Cal.3d at page 813, to the percentage specified in the parties' contingency agreement.

## The Costs Award

Plaintiff attacks the trial court's postjudgment rulings concerning the award of costs on two grounds. Both arguments lack merit.

First, it disputes the court's finding AIAC was a prevailing party. Plaintiff argues that since defendant and AIAC filed a joint answer to the complaint and were represented by the same counsel during trial, they held a unity of interest, which precludes AIAC from acquiring this status.

Code of Civil Procedure section 1032 defines prevailing party to include "a defendant in whose favor a dismissal is entered, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs who do not recover any relief against that defendant. . . . [I]n situations other than as specified, the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not and, if allowed may apportion costs between the parties on the same or adverse sides . . . ." (Code Civ. Proc., § 1032, subd. (a)(4).) Cases applying this statute hold that where one of multiple, jointly represented defendants presenting a unified defense prevails in an action, the trial court has discretion to award or deny costs to that party. (*Webber v. Inland Empire Investments, Inc.* (1999) 74 Cal.App.4th 884, 920 [88 Cal.Rptr.2d 594]; *Slavin v. Fink* (1994) 25 Cal.App.4th 722, 725–726 [30 Cal.Rptr.2d 750]; *Smith v. Circle P Ranch Co.* (1978) 87 Cal.App.3d 267, 272 [150 Cal.Rptr. 828].)

Plaintiff asserts the trial court did not exercise its discretion in this case, citing a statement by the trial judge during the hearing on the motion to strike AIAC's cost bill. However, the court made that comment in response to

plaintiff's contention "no evidence" exists "to support any particular allocation" between AIAC and Defendant, and that the latter entity presumably "fronted" AIAC's trial expenses. The record as a whole does not support a conclusion the trial court failed to exercise its discretion concerning AIAC's status and its recovery of costs.

The related arguments also fail. Contrary to plaintiff's assertion, this is not a case where it established wrongdoing against AIAC, but simply failed to recover a monetary award. The jury found AIAC did not commit fraud. Furthermore, since the injunctive relief claim had been previously dismissed, this was an action for damages. Thus, the evidence indicating AIAC subsequently modified its operating procedures concerning claims handling does not preclude it from being deemed a prevailing party.

Second, plaintiff contends the trial court erred by denying its recovery of expert witness fees under Code of Civil Procedure section 998. Nearly a year before trial, plaintiff served on defendant and AIAC an unsuccessful pretrial offer to compromise proposing "to allow judgment be taken . . . against defendants" for $626,489.26. In denying plaintiff's request for expert witness fees, the court cited *Taing v. Johnson Scaffolding Co.* (1992) 9 Cal.App.4th 579 [11 Cal.Rptr.2d 820].

■ Code of Civil Procedure section 998, subdivision (d) authorizes the court to award a prevailing plaintiff its expert witness fees if the plaintiff made a timely pretrial offer to compromise which the defendant does not accept, and "the defendant fails to obtain a more favorable judgment . . . ." In *Taing*, the court reversed an award of costs, declaring, "if a plaintiff elects to submit a section 998 offer in cases involving multiple defendants, the offer to any defendant against whom the plaintiff seeks to extract penalties for nonacceptance must be sufficiently specific to permit that individual defendant to determine the exact amount plaintiff is seeking from him or her." (*Taing v. Johnson Scaffolding Co., supra,* 9 Cal.App.4th at p. 586.) *Taing* explained its rule as follows: "[A]n unapportioned offer by a single plaintiff to multiple defendants . . . requires any defendant who wants to accept to obtain the concurrence of his or her codefendants. This places a reasonable defendant at the mercy of codefendants whose refusal to settle may be unreasonable." (*Id.* at p. 584.)

Defendant and AIAC were not jointly and severally liable to plaintiff. (Cf. *Steinfeld v. Foote-Goldman Proctologic Medical Group, Inc.* (1996) 50 Cal.App.4th 1542, 1547–1549 [58 Cal.Rptr.2d 371].) The complaint sought recovery against defendant on theories of breach of contract, bad faith, and fraud. AIAC was alleged to be liable only on the latter theory. Furthermore, the evidence relating to each defendant's liability for fraud was separate.

Thus, the trial court did not err by exercising its discretion to deny recovery of expert witness fees in this case.

*DEFENDANT'S APPEAL*

*Denial of an Offset*

Defendant moved to have the settlement amounts plaintiff received from Ferguson and TRM offset against the damages plaintiff recovered from it. The trial court issued a lengthy written order denying the request as to both the contractual damages and the tort damages recovered by plaintiff. Defendant contends the trial court erred by denying an offset in this case.

■ Consistent with the general rule imposing on a party the burden of proving the existence or nonexistence of each fact essential to a claim or defense (Evid. Code, § 500), "[a] defendant seeking an offset against a money judgment has the burden of proving the offset. [Citation.]" (*Conrad v. Ball Corp.* (1994) 24 Cal.App.4th 439, 444 [29 Cal.Rptr.2d 441].)

■ With respect to plaintiff's contractual recovery, an insured is entitled to receive compensation in accordance with the policy terms, and an insurer cannot reduce the amount recoverable "merely because [the insured] has 'collateral contracts or relations with third persons which relieve him wholly or partly from the loss against which the insurance company agreed to indemnify him.' [Citations.]" (*Strickland v. Federal Ins. Co.* (1988) 200 Cal.App.3d 792, 801 [246 Cal.Rptr. 345], quoting *Hughes v. Potomac Ins. Co.* (1962) 199 Cal.App.2d 239, 251 [18 Cal.Rptr. 650], disapproved on another ground in *Sabella v. Wisler* (1963) 59 Cal.2d 21, 34 [27 Cal.Rptr. 689, 377 P.2d 889].) An insurer's right to recoup payment of policy benefits is covered by the principle of subrogation. To qualify for subrogation, the insurer must pay the insured's loss. (*Sapiano v. Williamsburg Nat. Ins. Co.* (1994) 28 Cal.App.4th 533, 538 [33 Cal.Rptr.2d 659]; *Chase v. National Indemnity Co.* (1954) 129 Cal.App.2d 853, 861–862 [278 P.2d 68].)

Defendant refused to pay any policy benefits to plaintiff. The cases on which it relies to establish an offset against the contract damages involve an insured's recovery of tort damages and whether the collateral source rule applied. Its contention the trial court "misread" *Kardly v. State Farm Mut. Auto. Ins. Co.* (1989) 207 Cal.App.3d 479 [255 Cal.Rptr. 40] is incorrect. Contrary to defendant's claim, *Kardly* did not hold the insurer waives the right of subrogation by breaching the insurance contract. The part of the *Kardly* opinion defendant quotes refers to the facts of another appellate decision. (*Id.* at p. 489.) Thus, the trial court properly refused to offset the Ferguson and TRM settlements against the contractual damage award.

As for plaintiff's recovery of tort damages, the trial court agreed the collateral source doctrine did not apply because Ferguson and TRM could not be deemed collateral sources under the facts of this case. However, the court detailed the potential liability facing Ferguson and TRM, and found their potential liability exceeded $261,000, which included nonduplicative exposure exceeding $96,000. Applying the tort of another doctrine, the court concluded the settlement sums paid by Ferguson and TRM should not be offset against plaintiff's recovery from defendant.

 Generally, a party cannot obtain double recovery for the same wrong where joint or concurrent tortfeasors are jointly and severally liable for the same wrong. (6 Witkin, Summary of Cal. Law, *supra*, Torts, § 1322, p. 779.) "[I]t has long been recognized that if one tortfeasor pays partial compensation to the plaintiff, the liability of other tortfeasors will be correspondingly reduced: '. . . payments by one tortfeasor on account of a harm for which he and another are each liable, diminish the amount of the claim against the other whether or not it was so agreed at the time of payment and whether the payment was made before or after judgment. Since the plaintiff can have but one satisfaction, evidence of such payments is admissible for the purpose of reducing *pro tanto* the amount of the damages he may be entitled to recover.' [Citations.]" (*Krusi v. Bear, Stearns & Co.* (1983) 144 Cal.App.3d 664, 673 [192 Cal.Rptr. 793].)

 Where tortious acts by separate persons produce the same indivisible injury, each person is liable for the whole loss even if they did not act in concert. (*Sanchez v. Bay General Hospital* (1981) 116 Cal.App.3d 776, 796 [172 Cal.Rptr. 342].) Thus, while plaintiff sued defendant for breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud, but only sought damages against Ferguson and TRM for negligence, the injury it suffered was the same.

However, the court did find the tort of another doctrine applicable to this case. "A person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures thereby suffered or incurred. [Citations.]" (*Prentice v. North Amer. Title Guar. Corp.* (1963) 59 Cal.2d 618, 620 [30 Cal.Rptr. 821, 381 P.2d 645].)

 Generally, a party seeking to recover litigation costs under this rule must plead and prove the claim. (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 869, fn. 4 [39 Cal.Rptr.2d 824, 891 P.2d 804].) While plaintiff did not do so here, the potential for its recovery of damages from Ferguson and TRM was made known to them during pretrial discovery. Furthermore, had it not settled with

Ferguson and TRM, plaintiff could have amended the complaint to assert its right to recover the fees and expenses incurred in its action against defendant.

The record supports the trial court's denial of defendant's request for an offset.

## PUNITIVE DAMAGES

*Introduction*

Both parties attack the punitive damage award. However, in light of our conclusion concerning the validity of the amount of the award, the only issues that need to be considered are defendant's challenges to the sufficiency of the evidence supporting the recovery of exemplary damages and the constitutionality of the amount awarded to plaintiff, plus its claim for interest on the constitutionally excessive portion of the sum previously paid to plaintiff.

*Sufficiency of the Evidence*

Defendant claims its own conduct was not oppressive, fraudulent, or malicious, TRM's activity cannot be attributed to it, and it did not ratify TRM's actions.

Civil Code section 3294 authorizes the award of punitive damages in any "action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice . . . ." (Civ. Code, § 3294, subd. (a).) In *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809 [169 Cal.Rptr. 691, 620 P.2d 141] (*Egan*), the Supreme Court upheld an award of punitive damages against an insurer based on evidence two employees, a claims manager and a claims adjuster, failed to adequately investigate the insured's claims under a disability insurance policy. "The determination whether employees act in a managerial capacity, however, does not necessarily hinge on their 'level' in the corporate hierarchy. Rather, the critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy. When employees dispose of insureds' claims with little if any supervision, they possess sufficient discretion for the law to impute their actions concerning those claims to the corporation." (*Id.* at pp. 822–823.)

Subsequently, the Legislature amended Civil Code section 3294 to provide, "[A]n employer shall not be liable for [punitive] damages . . . based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious

disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." (Civ. Code, § 3294, subd. (b).)

In *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563 [88 Cal.Rptr.2d 19, 981 P.2d 944], the Supreme Court considered the effect of this amendment in an action for wrongful termination. A manager who was responsible for eight stores, covering 65 employees, had fired the plaintiff, a convenience store employee. The jury awarded plaintiff both compensatory and punitive damages.

In affirming, the Supreme Court concluded that "in amending section 3294, the Legislature intended (like *Egan, supra,* 24 Cal.3d at p. 823) to limit corporate punitive damage liability to those employees who exercise substantial independent authority and judgment over decisions that ultimately determine corporate policy." (*White v. Ultramar, Inc., supra,* 21 Cal.4th at p. 573.) The court noted, "section 3294, subdivision (b), placed ['managing agent'] next to the terms 'officer' and 'director,' intending that a managing agent be more than a mere supervisory employee. The managing agent must be someone who exercises substantial discretionary authority over decisions that ultimately determine corporate policy. Thus, by selecting the term 'managing agent,' and placing it in the same category as 'officer' and 'director,' the Legislature intended to limit the class of employees whose exercise of discretion could result in a corporate employer's liability for punitive damages." (*Ibid.*) The critical factor " ' "is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy." [Citation.]' " (*Id.* at p. 574.)

The agency agreement between defendant and TRM and the evidence in this case shows TRM had broad discretion over defendant's bus insurance program. TRM could "solicit, bind, write and administer insurance" policies, and "exercise [its] independent judgment as to the time, place and manner of soliciting insurance and servicing policyholders." There was evidence AIAC directed its employees to contact TRM when seeking coverage verification. In this case, TRM participated in issuing the policy to Ko, in subsequently canceling it, and then reinstating a modified version of it. Later, when Ko submitted a claim on the bus, TRM initially issued a coverage determination, but then prepared an endorsement deleting the vehicle from the policy, and advised AIAC to deny the claim. Furthermore, TRM's president was in contact with both AIAC and the senior management of the division handling defendant's bus program when plaintiff's claim was being considered, and participated in the ultimate decision to deny it. This evidence

supports the jury's conclusion TRM was defendant's managing agent, thereby subjecting it to punitive damages under Civil Code section 3294. (*White v. Ultramar, Inc., supra,* 21 Cal.4th at p. 577; *Egan, supra,* 24 Cal.3d at p. 823.)

In light of this conclusion it is unnecessary to consider defendant's additional claims concerning instructional error and alleged insufficiency of the evidence based on its own conduct.

*Validity of the Award*

Defendant contends even the $1.7 million punitive damage award is unconstitutional and excessive. In both our original and second opinions, we upheld the punitive damage award. The United States Supreme Court has directed us to reconsider this decision for a third time in light of its recent decision in *State Farm Mut. Auto. Ins. Co. v. Campbell, supra,* 538 U.S. 408 (hereinafter *State Farm*).

■ The rationale underlying punitive damages is to punish the wrong-doer and deter similar future wrongful conduct. (*State Farm, supra,* 538 U.S. at p. 416; *Cooper Industries, Inc. v. Leatherman Tool Group, Inc., supra,* 532 U.S. at p. 432; *PPG Industries, Inc. v. Transamerica Ins. Co.* (1999) 20 Cal.4th 310, 317 [84 Cal.Rptr.2d 455, 975 P.2d 652].) While the United States Supreme Court recognizes "the broad discretion" possessed by the states "with respect to the imposition of . . . punitive damages" (*Cooper Industries, Inc. v. Leatherman Tool Group, Inc., supra,* 532 U.S. at p. 433; see also *State Farm, supra,* 538 U.S. at p. 416), the federal Constitution's due process clause requires that a party potentially subject to such an award receive adequate notice of both the conduct that would support it and the severity of the penalty which could be imposed. (*State Farm, supra,* 538 U.S. at p. 417; *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 574 [134 L.Ed.2d 809, 116 S.Ct. 1589].) Thus, the Supreme Court has held federal due process "prohibits the States from imposing 'grossly excessive' punishments on tortfeasors [citations]." (*Cooper Industries, Inc. v. Leatherman Tool Group, Inc., supra,* 532 U.S. at p. 434.)

■ In determining if the punitive damage award in a particular case is " 'grossly disproportional to the gravity of . . . defendant[s'] offense[s]' " (*Cooper Industries, Inc. v. Leatherman Tool Group, Inc., supra,* 532 U.S. at p. 434), a reviewing court must conduct a "thorough, independent review" of the award (*id.* at p. 441), considering "three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered . . . and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil

penalties authorized or imposed in comparable cases. [Citation.]" (*State Farm, supra,* 538 U.S. at p. 418; see also *BMW of North America, Inc. v. Gore, supra,* 517 U.S. 559 at pp. 574–575.)

The first "guidepost," described as "the most important indicium of the reasonableness of a punitive damages award" (*BMW of North America, Inc. v. Gore, supra,* 517 U.S. at p. 575; see also *State Farm, supra,* 538 U.S. at p. 419), requires an appellate court to consider several factors. They include "whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. [Citation.]" (*State Farm, supra,* 538 U.S. at p. 419; see also *BMW of North America, Inc. v. Gore, supra,* 517 U.S. at pp. 575–576.)

The evidence clearly supports a conclusion TRM, defendant's managing agent, employed trickery and deceit in attempting to hide defendant's potential liability for plaintiff's claim. TRM began the fraudulent concealment scheme shortly after the bus accident by preparing and backdating a false deletion certificate. On at least two occasions, TRM submitted copies of this document to plaintiff with the date of preparation hidden behind a certificate of mailing. Plaintiff also presented evidence that TRM removed documents from the claims file. In addition, the record reflects this misconduct was not merely an isolated incident. Defendant continued to deny plaintiff's entitlement to benefits during the course of this litigation. Recently, this court considered a similar issue in an analogous context in *Diamond Woodworks, Inc. v. Argonaut Ins. Co.* (2003) 109 Cal.App.4th 1020 [135 Cal.Rptr.2d 736]. In finding the defendant-insurer's refusal to provide workers compensation benefits to one of plaintiff's employees constituted reprehensible conduct, we concluded the insurer engaged in repeated misconduct conduct because it "persisted in its denial of a defense for [the plaintiff-employer] and its denial of coverage for [the injured employee] for a period of 18 months." (*Id.* at p. 1054.)

 Thus, the record confirms the existence of two factors supporting a conclusion that defendant, through its managing agent, engaged in reprehensible conduct supporting an award of punitive damages under the due process clause. (*State Farm, supra,* 538 U.S. at p. 419.) Defendant again repeats its claim that TRM, not it, committed the wrongdoing and its liability for TRM's actions is merely vicarious. But as we have repeatedly explained, TRM "exercise[d] substantial discretionary authority over decisions . . . ultimately determin[ing] corporate policy" for defendant's bus insurance program (*White v. Ultramar, Inc., supra,* 21 Cal.4th at p. 573), and thus constituted

defendant's managing agent. Imposing punitive damages on a corporate entity under the respondeat superior doctrine based on its agent's fraudulent conduct does not violate the federal Constitution's due process clause. (*Pacific Mut. Life Ins. Co. v. Haslip* (1991) 499 U.S. 1, 14–15 [113 L.Ed.2d 111, 1 S.Ct. 1032].) Simply describing its liability as vicarious does not militate against imposing a proportionately appropriate punitive damage award against defendant based on TRM's wrongdoing.

But plaintiff suffered only economic harm in the form of defendant's denial of policy benefits and the expense incurred to enforce its rights under the policy. Nor can plaintiff be described as a financially vulnerable victim of defendant's wrongful conduct. While plaintiff contends defendant's conduct reflected its indifference or reckless disregard as to the health and safety of Ko and any individuals potentially injured in the bus accident, this lawsuit concerns only defendant's wrongdoing as it relates to plaintiff. *State Farm* recognized that "[d]ue process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of reprehensibility analysis . . . . [Citation.]" (*State Farm, supra,* 538 U.S. at p. 423.)

The second "guidepost" focuses on the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award. In *State Farm*, the Supreme Court reiterated its "reluctan[ce] to identify concrete constitutional limits on the ratio between" compensatory and punitive damages (*State Farm, supra,* 538 U.S. at p. 424), declaring "[t]he precise award in any case . . . must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." (*Id.* at p. 425.) Nonetheless, the court identified certain guidelines to apply in determining whether the punitive damage award is reasonable and proportionate to the harm suffered by the plaintiff. Citing centuries of "legislative history . . . providing for sanctions of double, treble, or quadruple damages to deter and punish" (*ibid.*), the Supreme Court noted, "Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." (*Ibid.*)

Again, our recent opinion in *Diamond Woodworks, Inc. v. Argonaut Ins. Co., supra,* 109 Cal.App.4th 1020, is instructive. After discussing *State Farm* and earlier Supreme Court decisions, we concluded they "suggest that in the usual case, i.e., a case ·in which the compensatory damages are neither exceptionally high nor low, and in which the defendant's conduct is neither exceptionally extreme nor trivial, the outer constitutional limit on the amount of punitive damages is approximately four times the amount .of compensatory damages." (*Diamond Woodworks,* at p. 1057.)

 This case falls within the foregoing rule. The wrongdoing attributed to defendant is sufficiently reprehensible to support a punitive damage award. But, contrary to plaintiff's claim, the compensatory damages awarded to it gave plaintiff full recovery for its loss in this case. (See *State Farm, supra,* 538 U.S. at p. 419.) Plaintiff cites defendant's purported wealth and complains an award smaller than the trial court's 10-to-1 ratio would "render the award laughable." But our review of the punitive damages award must ensure the recovery comports with due process. The Supreme Court has recognized that "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award. [Citations.]" (*State Farm, supra,* 538 U.S. at p. 427; see also *Diamond Woodworks, Inc. v. Argonaut Ins. Co., supra,* 109 Cal.App.4th at p. 1056.)

As a corollary to its attack on the constitutionality of the punitive damage award, defendant argues consideration of the proportionality of the punitive damages to compensatory damages must focus on the amount awarded for breach of the implied covenant of good faith and fair dealing and for fraud ($89,744), excluding the sum plaintiff recovered on the contract claim ($75,670.40). This argument has merit.

Civil Code section 3294, subdivision (a) allows the recovery of punitive damages "[i]n an action for the breach of an obligation not arising from contract, where it is proven . . . the defendant has been guilty of oppression, fraud, or malice . . . ." *Diamond Woodworks* also recognized a consideration of the disparity between compensatory and punitive damage awards must focus on the compensatory damages awarded on "only [the] cause[s] of action providing a basis for punitive damages in this case." (*Diamond Woodworks, Inc. v. Argonaut Ins. Co., supra,* 109 Cal.App.4th at p. 1056, fn. 35.) Here, the parties held separate trials on the breach of contract count and the tort claims and the jury returned separate awards on them. In addition, the jury's finding that defendant acted with oppression, fraud, or malice applied solely to the latter two counts. Thus, our consideration of the disparity between plaintiff's actual harm and the punitive damage award must be limited to its tort relief.

The third "guidepost" concerns "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. [Citation.]" (*State Farm, supra,* 538 U.S. at pp. 418, 428.) Defendant notes the Insurance Code only imposes a maximum fine of $10,000 for willful misconduct by insurers. (Ins. Code, § 790.035.) Plaintiff cites us to the potential criminal penalties contained in Penal Code section 550. But this latter provision is of little assistance here. In *State Farm,* the Supreme Court noted that, while "[t]he existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful

action," when a criminal penalty is "used to determine the dollar amount of the award," it "has less utility." (*State Farm, supra,* 538 U.S. at p. 428.) "Great care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, of course, its higher standards of proof. Punitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award." (*Ibid.*)

Applying the United States Supreme Court's "guideposts" to this case, we conclude the punitive damage award, even as reduced by the trial court, is excessive and violates the federal Constitution's due process clause. Accordingly, we shall reverse the order remitting punitive damages to $1.7 million and modify the judgment to reduce the punitive damage award to $360,000, a sum approximating four times the compensatory damages awarded on the claims for breach of the implied covenant of good faith and fair dealing and fraud.

*Restitution*

Defendant claims that, on June 8, 2001, subsequent to the finality of our original judgment, it paid the outstanding judgment when plaintiff threatened to execute on it. Citing Code of Civil Procedure section 908, defendant argues it is entitled to not only recover the constitutionally excessive portion of the punitive damage award, but interest on it from the date of payment. Plaintiff opposes the payment of interest contending it is inequitable and "would only add insult to injury."

Code of Civil Procedure section 908 declares, "When the judgment or order is reversed or modified, the reviewing court may direct that the parties be returned so far as possible to the positions they occupied before the enforcement of or execution on the judgment or order. In doing so, the reviewing court may order restitution on reasonable terms and conditions of all property and rights lost by the erroneous judgment or order, so far as such restitution is consistent with rights of third parties and may direct the entry of a money judgment sufficient to compensate for property or rights not restored. The reviewing court may take evidence and make findings concerning such matters or may, by order, refer such matters to the trial court for determination."

As plaintiff recognizes, our power to award interest under Code of Civil Procedure section 908 is discretionary and interest may be denied if an award would be inequitable under the circumstances. (*Holmes v. Williams* (1954) 127 Cal.App.2d 377, 379 [273 P.2d 931].) The only bases plaintiff cites for denying recovery of interest on the excess portion of the punitive

damage award are the litigation expenses it has incurred during this lawsuit, plus defendant's fraudulent conduct underlying this litigation. Neither claim supports denying restitution to defendant. The general rule is that, " [e]xcept as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys . . . is left to the agreement . . . of the parties . . . ." (Code Civ. Proc., § 1021.) If an opponent's cost of litigating a matter constitutes a basis for denying restitution under Code of Civil Procedure section 908, few parties would be entitled to relief.

Plaintiff's unclean hands defense fares no better. "The misconduct that brings the unclean hands doctrine into play must relate directly to the cause at issue. Past improper conduct or prior misconduct that only indirectly affects the problem before the court does not suffice. The determination of the unclean hands defense cannot be distorted into a proceeding to try the general morals of the parties. [Citations.]" (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 979 [90 Cal.Rptr.2d 743].) Defendant's fraudulent conduct occurred in the events leading to this litigation. There is no indication it engaged in inequitable conduct in the postjudgment proceedings. Defendant paid the judgment apparently when plaintiff threatened to execute on it. Had plaintiff chosen to await termination of the proceedings in the United States Supreme Court before seeking recovery, it would be entitled to interest on the sum finally awarded. To deny defendant recovery of interest on the excessive portion of the punitive damage award would be inequitable.

## DISPOSITION

The orders denying defendant's motion for judgment notwithstanding the verdict, awarding costs to AIAC, and denying plaintiff recovery of its expert witness fees are affirmed. The order remitting punitive damages to $1.7 million is reversed. The portions of the judgment in favor of AIAC and awarding plaintiff compensatory damages are affirmed. The portion of the judgment awarding plaintiff punitive damages is modified to reduce the award to $360,000. As so modified, the judgment is affirmed. Each party shall bear its own costs on appeal.

Sills, P. J., and O'Leary, J., concurred.

A petition for a rehearing was denied June 18, 2004, and the opinion was modified to read as printed above. The petition of appellant Textron Financial Corporation for review by the Supreme Court was denied September 15, 2004.