[Civ. No. 25211.   Second Dist., Div. Four.   Feb. 15, 1962.]

ROBERT H. BUSCH, Plaintiff and Appellant, v. GLOBE INDUSTRIES et al., Defendants and Respondents.

Spiegel, Lincoff & Wolfson and Aaron L. Lincoff for Plaintiff and Appellant.

Gordon & Weinberg, Gerald N. Gordon and Leonard D. Weinberg for Defendants and Respondents.

JEFFERSON, J.—This is an appeal from a judgment for defendants in an action for breach of contract. The case was tried by the court, sitting without a jury.

Viewing the evidence favorably to defendants it appears that on or about December 11, 1955, plaintiff Robert H. Busch and defendant Globe Industries, a copartnership consisting of Robert Friedland and Nathan Reis, also known as Nathan Reese, entered into a contract. Under the terms of the agreement plaintiff obtained an exclusive agency distributorship for Globeware (cooking utensils sold by defendant Globe Industries) in 16 eastern states, and the District of Columbia for a period of two years from the date of the contract.

The contract provided in part: "Globe agrees that it will not enter into any contract contemplating the shipment of Globeware into any of the states hereinabove listed as comprising the territory of Busch, without first communicating with Busch and obtaining his agreement thereto."

Plaintiff went to New York in early January 1956 to form his sales organization and began selling Globeware in February.

In May 1956, in response to plaintiff's complaints concerning defective merchandise, defendant Friedland and his employee Milton Kanter flew to New York. While there Friedland and plaintiff negotiated with Colgate-Palmolive Peet Company in reference to a possible promotional program for Globeware. Plaintiff consented to this and in reference to compensation defendant Friedland promised plaintiff he would do "the fair thing." Plaintiff was left in charge of the Colgate matter which later proved unsuccessful.

Throughout the period of the exclusive agency contract defendants made other attempts to enter into promotional campaigns for Globeware with various national companies. Plaintiff was told about these promotions, and he understood that in the event they were consummated they would result in sales within his exclusive territory.

During the summer of 1956 plaintiff participated in promotional negotiations with Armour and Company in Chicago, Illinois. He was subsequently told that defendants were continuing to negotiate with Armour, and he did not object. In fact he welcomed the possibility of additional sales in his territory because of the Armour promotion. These supplementary negotiations, conducted by defendants after plaintiff returned to New York, resulted in a contract on November 8, 1956, between Armour and Company and defendant Globe Metal Products Company, a copartnership also consisting of Robert Friedland and Nathan Reis. By the terms of this agreement (herein referred to as the "Armour contract" or the "Armour deal") a nationwide program for the promotion and sale of Globeware during the following year was arranged through the device of a premium coupon to be placed in a package of Armour and Company products. When mailed to the defendants with the sum of $3.00 these coupons entitled the sender to receive a Globeware skillet.

On the 15th or 16th of November, 1956, defendant Nathan Reis called New York and talked to plaintiff in an attempt to collect a debt of approximately $3,000 which had been owing over six months. He told plaintiff that he needed the money for operation of the business. Plaintiff asked, "Well, what about the Armour deal? Aren't you getting money from that?" Reis told defendant that the Armour deal was not due to "kick off" until the beginning of 1957. Plaintiff then stated he did not have the money. Defendant suggested that plaintiff return part of the merchandise equivalent to the amount of the debt. Plaintiff stated: "Well, I don't want to

ship back the merchandise just that I didn't pay for, I would rather ship it all back and get out of this business anyway because I have something else I would rather do, I think I can make a better living at.'' Reis told plaintiff that he would have to discuss this with his partner Friedland. The following day, after reviewing this conversation with his partner, defendant Reis telephoned plaintiff and told him they would not object if he wanted to ship all the merchandise back. After taking plaintiff's inventory over the phone Reis told him that he would send a check. A check was not sent because defendants decided to send an employee, Kanter, to New York to verify plaintiff's inventory. Before Kanter arrived in New York defendants received a telegram from plaintiff in which plaintiff threatened to dispose of the merchandise at 75 cents per utensil and charge defendants for the difference because he had not received the check for his inventory, but this sale was never made.

After Kanter arrived he and plaintiff were unable to work out any arrangement whereby plaintiff would continue in business. Plaintiff told Kanter he had had one job interview and was waiting to have another. He also said he was selling his furniture, was going to close his business, and wanted to get his merchandise out before the lease on the warehouse expired. At plaintiff's suggestion Kanter repurchased all of plaintiff's inventory, advertising materials and sales kits. After arranging for payment of the money plaintiff assisted Kanter in preparing the inventory for shipment back to Los Angeles. These negotiations were consummated on November 29, 1956.

The promotional program under the Armour contract during the following year was moderately successful. Between February and December 11, 1957, defendants had gross sales of $34,257 in the territory specified in the original contract with plaintiff.

Plaintiff then sued for damages and an accounting alleging in his complaint that he sustained damages as a result of two breaches of the exclusive agency contract. The first breach concerned shipments of defective merchandise which plaintiff was unable to sell, and which allegedly destroyed his business. The trial court found that the Globeware which plaintiff received was saleable and marketable, and plaintiff makes no contentions against these findings on this appeal. The second breach related to the promotional campaign which occurred pursuant to the Armour contract and resulted in sales of Globeware in plaintiff's exclusive territory.

The trial court found that the parties executed the original written contract as previously recited. The court also found:

"16. That after March 30, 1956 plaintiff and defendants orally modified the written contract . . . in that plaintiff and defendants did jointly seek national promotional programs for the distribution of defendants' Globeware; that at all times plaintiff had knowledge of the various promotional plans and had knowledge of the Armour contract. The compensation to be received by plaintiff under any promotional plan was not agreed upon and was something that remained to be determined at a future date. Plaintiff at all times consented to and had knowledge of the various promotions including but not limited to the Armour transaction.

". . . . . . . . . .

"18. That plaintiff was at all times advised of and consented to the negotiations and the execution of the Armour contract.

"19. Plaintiff and defendants terminated and abandoned any contractual relationship that still existed on November 29, 1956, at which time defendants repurchased all of plaintiff's inventory, and plaintiff terminated and ceased doing business as a distributor or agent of defendants; that as of November 29, 1956 plaintiff had full knowledge of the Armour contract."

From these findings of fact the court concluded as a matter of law there was no breach of contract and therefore plaintiff was not entitled to damages. Judgment was entered for defendants.

Plaintiff appeals from the judgment on the ground that the findings of fact are erroneous and do not support the judgment. Plaintiff's principal contention appears to be that the written contract was not modified to allow promotional activities in his area, and therefore there was a breach of contract; or, if there was a modification of the agreement, that he was entitled to compensation under the existing agreement as modified because the agreement was not abandoned.

Plaintiff urges the evidence does not support finding 16 that there was an oral modification of the written contract after March 30, 1956. However, the evidence clearly establishes that plaintiff participated in the negotiations with Armour and that he was fully advised about the Armour contract and all its details. This evidence is substantial and supports finding 16.

"A contract in writing may be altered by contract in writing, or by an executed oral agreement, and not otherwise." (Civ. Code, § 1698.) ■ A written contract may expressly provide for modification. (*Snow Mountain Water & Power Co.* v. *Kraner*, 191 Cal. 312, 323 [216 P. 589].) ■ When a modification is in accordance with a provision authorizing and setting forth a method for its revision the rule that a contract in writing may be altered only by another written contract or an executed oral agreement has no application because there is no alteration. ■ The modification is in accordance with the terms of the contract. (*Hunt* v. *Mahoney*, 82 Cal.App.2d 540, 546 [187 P.2d 43].) In the instant case the contract provided that Globe Industries would not "enter into any contract contemplating the shipment of Globeware into . . . the territory of Busch, without first communicating with Busch and obtaining his agreement thereto." The evidence showed there was communication of the Armour deal to Busch and that by his conduct he consented thereto. Therefore there was no alteration or revision of the contract but only conduct pursuant to and in conformity with the agreement. If considered a modification, the method of modifying the contract was provided for therein and followed by the parties.

Plaintiff next contends there was no evidence in the record to support findings 18 and 19, which in substance found that defendant terminated and abandoned the contract with knowledge of and consent to the Armour contract. ■ A contract remains in force until it has been terminated either according to its terms or through the acts of the parties evidencing an abandonment. (*Groves* v. *Superior Court*, 62 Cal. App.2d 559, 565 [145 P.2d 355].) ■ ■ Abandonment of a contract is a matter of intent and is to be ascertained from the facts and circumstances surrounding the transactions out of which the abandonment is claimed to have resulted. It may be implied from the acts of the parties. (*Treadwell* v. *Nickel*, 194 Cal. 243, 259 [228 P. 25] ; *Lohn* v. *Fletcher Oil Co., Inc.*, 38 Cal.App.2d 26, 30 [100 P.2d 505].)

From the facts heretofore recited there was substantial evidence to support the findings of the trial court that the written contract of December 13, 1955, was orally modified after March 30, 1956; therefore, the Armour contract of November 8, 1956, did not constitute a breach of the basic agreement, and the latter was mutually abandoned by the parties on November 29, 1956. Further, there was no evidence

indicating the parties intended to reserve any rights after the abandonment.

Plaintiff additionally attacks the following findings:

"17. That the written contract . . . was abandoned by the plaintiff on or about July 17, 1956.

"          .     .     .     .     .     .     .     .

"20. Plaintiff while operating as a distributor of defendants' Globeware did not operate at a net profit but, in fact, operated at a loss."

The record reveals no substantial evidence to support these findings, but the correctness of findings 16, 18 and 19 obviate the necessity of reversal on the basis of this contention.

■ Erroneous or unsupported findings of fact will be disregarded as being harmless error if the judgment as rendered can be sustained on the supported and proper findings made by the trial court. (*Church of Merciful Saviour* v. *Volunteers of America,* 184 Cal.App.2d 851, 861 [8 Cal.Rptr. 48] ; *Hay* v. *Allen,* 112 Cal.App.2d 676, 681 [247 P.2d 94].)

■ Plaintiff further contends there has not been a finding on all material issues in accordance with *Kaiser* v. *Mansfield,* 141 Cal.App.2d 428, 433 [297 P.2d 98]. The court found:

"21. All of the allegations in plaintiff's amended complaint not specifically found to be true herein are untrue.

"22. All of the allegations in defendants' answer not specifically untrue herein are true."

In the *Kaiser* v. *Mansfield* case, *supra,* at page 433, the court discussed the validity of findings quite similar to those involved here, saying: "This erroneous method of general coverage of numerous important factual issues would *alone* necessitate a reversal of the judgment." (Italics added.) As stated in *Thornton* v. *Stevenson,* 185 Cal.App.2d 708, 712 [8 Cal. Rptr. 603] : "[T]his language would be fatal and require reversal in the case here at bar unless the explicit affirmative findings made do, in fact and in law, fully cover the issues at bar." Plaintiff has failed to show that there was a single material fact not found by the trial court, and it is unnecessary for the court to make specific findings on other subordinate or probative issues. We hold in this case the trial court did find affirmatively on all the material issues and a reversal would not be either justified or necessary merely because of the general findings 21 and 22 above mentioned.

There is no reversible error relating to the findings of fact or the conclusions of law. The judgment is affirmed.

Burke, P. J., and Balthis, J., concurred.