[No. D050479. Fourth Dist., Div. One. Jan. 6, 2009.]

PATRICK A. MAJOR et al., Plaintiffs and Respondents, v.
WESTERN HOME INSURANCE COMPANY, Defendant and Appellant.

1200

## COUNSEL

Horvitz & Levy, Lisa Perrochet, Margaret S. Thomas; Law Offices of Kenneth N. Greenfield and Kenneth N. Greenfield for Defendant and Appellant.

Levine, Steinberg, Miller & Huver and Craig A. Miller for Plaintiffs and Respondents.

## OPINION

**NARES, J.**—In this insurance bad faith action arising out of the destruction of Patrick A. and Elsa L. Major's (together the Majors) home in the Cedar Fire in October 2003, their insurer, Western Home Insurance Company (Western), appeals from a jury verdict against it totaling approximately $1.3 million, consisting of $31,359.55 in economic damages, $450,000 in noneconomic damages, $189,000 in attorney fees, and $646,471.53 in punitive damages. On appeal, Western asserts the verdict must be reversed because (1) it had no legal duty to pay the insurance benefits the Majors claim were withheld because they were "courtesy benefits" over and above the coverage limits in their policy; (2) no substantial evidence supports the amount of compensatory damages awarded by the jury; (3) the award of noneconomic damages is excessive; (4) the emotional distress award is the result of prejudicial instructional error; (5) the amount of the attorney fees award is not supported by substantial evidence; (6) the punitive damages award is not supported by substantial evidence that a "managing agent" of Western committed the alleged bad faith; (7) a new trial on the amount of punitive damages is necessary if this court reduces or eliminates the compensatory damages award; and (8) the punitive damages verdict is inconsistent on the findings on malice and oppression. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

#### A. *The Insurance Policy*

In 2001 the Majors obtained a homeowners policy from Western for their house in El Cajon, California. At the time of the fire, the policy provided coverage of $193,000 for their dwelling (coverage A), $19,300 for other structures (coverage B), $135,100 for personal property (coverage C), $38,600 for living expenses (coverage D), and $18,000 for mortgage disaster protection.

---

[1] Because we are reviewing whether substantial evidence supports the jury's verdict in this case, we must accept all evidence which supports plaintiffs, disregard the conflicting evidence, and draw all reasonable inferences to uphold the verdict. (*Munoz v. Olin* (1979) 24 Cal.3d 629, 635–636 [156 Cal.Rptr. 727, 596 P.2d 1143].)

The policy was an "extended replacement cost" policy. Under this coverage, "In the event of any covered loss" to the Majors' home, Western agreed to repair or replace their home "up to specified percentage over the policy's limits of liability" as specified in the declarations page of the policy. The declarations page specified that the extended replacement cost was 25 percent over the policy limits, meaning the coverage under the policy, as written, called for coverage A limits of $241,250, coverage B of $24,125, coverage C of $168,875, and coverage D of $48,250.

As a condition to recovering extended replacement cost coverage, Western required that the dwelling coverage limits be equal to the cost to replace the home. In order to ensure the proper amount of coverage was granted, the policy required that the Majors "must permit an inspection of the dwelling by the insurance company" and required a physical inspection of the home be made and a report issued identifying the replacement cost. However, Western did not send an inspector until after the policy was issued and the coverage limits set. The inspection report identified the replacement cost as $235,578, approximately $43,000 more than the coverage for the dwelling listed in the policy. Based on this valuation, the extended replacement cost coverage for coverage A should have been $305,216, for coverage B $30,522, for coverage C $213,651, and coverage D $61,043.

As will be discussed, *post*, once the discrepancy was discovered after the Majors retained counsel, Western, by a letter dated February 23, 2005, increased the coverage limits to match these amounts. This was based upon Western's policy that required a modification of the coverage amount if the inspection number was not equal to the coverage in the policy.

The policy allowed for modifications, but required that in order to be valid they must be in a writing prepared by Western.

### B. *The Cedar Fire and Western's Claims Handling*

In October 2003 the Cedar Fire burned the Majors' home and all of their personal belongings in the house. The only things that survived were "a few pieces of porcelain . . . [and] a couple jars of pennies that were kind of fused together."

Western used a company named Cambridge Integrated Services (Cambridge) to administer their claims. Cambridge regional manager/supervisor/claims representative Linda Dare supervised the Majors' file and agreed that "[t]ime was of the essence" because their home was gone. In October 2003 Dare assigned the file to claims adjuster Richard Fleming. Western did not make its first payment on the dwelling until February 2004. Western failed to make a

mortgage payment on time that month. Fleming also refused to provide the Majors with a copy of the policy, despite several requests.

In May 2004 Dare reassigned the claim to Andrew Anderson. At that time, Anderson had not received training required by California law in fair claims settlement practice.[2] Moreover, although Dare knew that requiring an adjuster to process anything more than 75 to 100 claims was "way too many to handle," over the time the Majors' claim was assigned to Anderson, he handled over 200 other claims.

At the time Anderson took over the file, Western was two months behind on payment of mortgage benefits and behind in payments for the trailer the Majors were living in on their property. The Majors received complaints from their lender and had to use their savings to pay their mortgage. In May 2004 Patrick Major sent a letter to Western regarding unresolved issues regarding their claim. They submitted invoices for $25,315 to replace their pool, inquired about replacing a spa destroyed by the fire, and told Anderson they would be providing an inventory of personal property lost in the fire. Shortly thereafter, the Majors sent Western a 77-page inventory of personal property for payment.

Anderson did not respond and the Majors followed up with phone calls on May 25, 28 and June 1, 2004. On June 2, Anderson called back and told the Majors he had not reviewed the claims file and would call them back on June 7. He did not do so and the Majors called him on June 9. At that time, Anderson again said he had not reviewed the file and told them their claim was "third in his stack." He told the Majors on at least three occasions their claim was not his top priority.

On June 15, 2004, the Majors contacted Anderson again because the issues raised in their May 14 letter had still not been addressed. Anderson told the Majors that two adjusters had quit, he had been given additional files to manage, and he had not yet read the claims file. On June 25, 2004, the Majors again contacted Western regarding the issues raised in the May 14 letter. Anderson said he had "glanced over [the letter] but ha[d]n't had time to go over it yet."

Anderson reviewed the May 14 letter on or about July 12. Anderson thereafter told the Majors they were not entitled to recover the cost of replacing their pool because it fell within the coverage for the dwelling, and

---

[2] Title 10, section 2695.6 of the California Code of Regulations requires insurance companies to provide such training to their adjusters and certify they have received such training.

the policy limit for the dwelling had already been met. Anderson also stated he did not know what coverage the spa fell under. He stated he had not read the personal property inventory, which constituted the most significant part of the Majors' remaining claims.

On August 30, 2004, Anderson admitted that he had still not reviewed the personal property inventory and told the Majors it would be a "nightmare" to have to do so. On September 13, 2004, the Majors again inquired about the progress on the claim. In response, Anderson indicated the file was "16 inches thick." That statement, together with his inability to accomplish anything to that point led the Majors to believe he had never reviewed the claims file. If he had reviewed the file, there should have been notations reflecting that fact in the file. There were no such notations.

On September 16, 2004, Western again failed to pay mortgage benefits.

Nevertheless, by April or May of 2005 Western had paid all policy benefits due under the policy.

### C. *The Majors Retain Counsel*

In October 2004 the Majors retained legal counsel. Elsa Majors testified this was necessary because "[w]e were tired of the phone calls, tired of not being able to get ahold of them or have them call us back. We were exhausted. We had no choice."

Fifteen days later, Western paid the total amount of personal property benefits the Majors had submitted in May.

Moreover, after the Majors retained counsel, Western's vice president of claims and legal services, Donald Grimm, reviewed the inspection report for the Majors' property and noted that it had a replacement cost for the Majors' house that was "significantly higher" than the coverage limit in the policy. He thereafter authorized an increase in the policy limits to correspond to the replacement cost set forth in the inspection report.

### D. *The Majors File Suit*

The Majors filed suit in February 2005. Three weeks later, Western, through Dare, sent a letter to the Majors' counsel, increasing coverage limits for dwellings, other structures, personal property, and additional living expenses, to reflect the difference between the coverage limits of the policy and the replacement costs reflected in the inspection report. It stated that the "letter confirms that [Western] is increasing the Coverage A limits of the

Major's homeowners' insurance policy to 236,000." The stated "new limits" for coverage B was $30,522, for coverage C was $213,651, and coverage D was $61,043. Dare's letter stated, "There may be additional benefits *owed* to the Majors resulting from the revised coverage limits." (Italics added.)

Dare assumed claims handling duties after the Majors retained counsel in October 2004. She immediately recognized that the Majors had not received benefits under the "other structures" coverage for the pool and spa, but did not pay those benefits until late April, a period of over five months from the time Dare began handling the file. At trial Dare agreed the delay in payment for those items was "wrong."

In January or February 2006 the Majors submitted receipts for the replacement cost of the personal property for which Western had thus far only paid a depreciated value. Dare refused to pay the Majors their supplemental personal property benefits because she asserted they needed to see receipts and requested the Majors match the receipts to the inventory submitted in support of the claim. After the Majors submitted receipts, Dare told the Majors Western would not pay the increased personal property policy limits because the receipts were faxed and she could not read them. However, she admitted at trial that this statement was false as the receipts were not faxed to her, but were sent by mail.

Elsa Major testified that after Western increased the coverage by virtue of the February 2005 letter, the Majors submitted a second claim for personal property (coverage C) benefits that exceeded $30,000. As of the time of trial, the Majors had paid $6,070 in attorney fees.

### E. *Trial and Judgment*

The case went to a jury on the Majors' claims for breach of contract, bad faith, and promissory fraud. The court granted a nonsuit on their claim for reformation of the contract because of alleged underinsurance.

The jury found in Western's favor on the false promise claim, but found in the Majors' favor on the breach of insurance contract and bad faith claims. The jury awarded the Majors $31,359.55 in personal property benefits, $450,000 in emotional distress damages, and $189,000 in *Brandt*[3] attorney fees.

The jury also found that Western acted with oppression, and awarded $646,471.53 in punitive damages. The court thereafter entered judgment in the total amount of $1,316,831.

---

[3] (*Brandt v. Superior Court* (1985) 37 Cal.3d 813, 817 [210 Cal.Rptr. 211, 693 P.2d 796] (*Brandt*).)

### F. *Motion for New Trial and Judgment Notwithstanding the Verdict*

Western brought a motion for new trial and for judgment notwithstanding the verdict arguing, among other things, that the evidence was insufficient to support the judgment and the award of noneconomic and punitive damages was excessive. The court denied both motions. Western also argued the contract was not modified and that the additional coverage provided to the Majors was a "gift."

With respect to the evidence in support of the compensatory damages award of $31,359.55, the court found substantial evidence supported that award because "the jury could have drawn inferences from both the comments of the insurance witnesses as well as the comments of the Majors that [these were], in fact, additional receipts that . . . justify the additional payment . . . ."

## DISCUSSION

### I. *ECONOMIC DAMAGES*

Western asserts the economic damages award must be reversed because (1) it was not contractually obligated to pay the "gratuitous" "courtesy" benefits that the jury awarded as economic damages, and (2) there is no substantial evidence to support the economic damages award. We reject these contentions.

#### A. *Standard of Review*

So long as there is "substantial evidence" to support a jury award, the appellate court must affirm, even if the reviewing court would have ruled differently had it presided over the proceedings below, and even if other substantial evidence would have supported a different result. Stated another way, when there is substantial evidence in support of the jury or trial court's decision, the reviewing court has no power to substitute its deductions for those of the trier of fact. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874 [197 Cal.Rptr. 925]; *Rupf v. Yan* (2000) 85 Cal.App.4th 411, 429–430 [102 Cal.Rptr.2d 157].) The testimony of a single credible witness—even if a party to the action—may constitute "substantial evidence." (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479].)

#### B. *Applicable Authority*

██ As in every other contract, an implied covenant of good faith and fair dealing is implicit in an insurance contract: " 'Every contract imposes upon

each party a duty of good faith and fair dealing in its performance and its enforcement.' " (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683 [254 Cal.Rptr. 211, 765 P.2d 373].) " 'Good faith performance . . . of a contract emphasizes faithfulness to an agreed common purpose and consistency with the [reasonably] justified expectations of the other party . . . .' " (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 922, fn. 5 [148 Cal.Rptr. 389, 582 P.2d 980] (*Neal*).) The fundamental purpose of the implied covenant of good faith and fair dealing is " 'that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.' " (*Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 573 [108 Cal.Rptr. 480, 510 P.2d 1032].)

In *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 820 [169 Cal.Rptr. 691, 620 P.2d 141] (*Egan*), the California Supreme Court explained the rationale for an insurer's obligation of good faith and fair dealing to its insured: " 'The insurers' obligations are . . . rooted in their status as purveyors of a vital service labeled quasi-public in nature. Suppliers of services affected with a public interest must take the public's interest seriously, where necessary placing it before their interest in maximizing gains and limiting disbursements . . . [A]s a supplier of a public service . . . the obligations of insurers go beyond meeting reasonable expectations of coverage. The obligations of good faith and fair dealing encompass qualities of decency and humanity inherent in the responsibilities of a fiduciary. Insurers hold themselves out as fiduciaries, and with the public's trust must go private responsibility consonant with that trust.' "

An insurer is said to act in "bad faith" when it breaches its duty to deal "fairly" and "in good faith" with its insured. (*Neal, supra,* 21 Cal.3d at p. 921.) The term "bad faith" does not connote "positive misconduct of a malicious or immoral nature" (*id.* at p. 922, fn. 5); it simply means the insurer acted deliberately.

Moreover, to establish the insurer's "bad faith" liability, the insured must show that the insurer has (1) withheld benefits due under the policy, and (2) that such withholding was "unreasonable" or "without proper cause." (*Gruenberg v. Aetna Ins. Co., supra,* 9 Cal.3d at pp. 573–574.) The actionable withholding of benefits may consist of the denial of benefits due (*McLaughlin v. Connecticut General Life Ins. Co.* (1983) 565 F.Supp. 434, 450–452); paying less than due (*Neal, supra,* 21 Cal.3d at p. 921); and/or unreasonably delaying payments due (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36 [44 Cal.Rptr.2d 370, 900 P.2d 619]).

In first party cases, the implied covenant of good faith and fair dealing obligates the insurer to make a thorough investigation of the insured's claim

for benefits, and not to unreasonably delay or withhold payment of benefits. If the insurer "without proper cause" (i.e., unreasonably) refuses to timely pay what is due under the contract, its conduct is actionable as a tort. (*Gruenberg v. Aetna Ins. Co., supra,* 9 Cal.3d at pp. 573–574.) "The gravamen of a first party [bad faith] lawsuit is a breach of the implied covenant of good faith and fair dealing by refusing, without proper cause, to compensate the insured for a loss covered by the policy . . . or by unreasonably delaying payments due under the policy . . . ." (*Waters v. United Services Auto Assn.* (1996) 41 Cal.App.4th 1063, 1070 [48 Cal.Rptr.2d 910], citation omitted (*Waters*).)

### C. *Analysis*

#### 1. *Western was contractually bound to pay the personal property claim*

■ Civil Code section 1698, subdivision (a) provides that "[a] contract in writing may be modified by a contract in writing." Moreover, a modification ordinarily must be supported by new consideration. (Civ. Code, § 1698, subd. (c).)

However, "A written contract may expressly provide for modification. [Citation.] When a modification is in accordance with a provision authorizing and setting forth a method for its revision the rule that a contract in writing may be altered only by another written contract or an executed oral agreement has no application because there is no alteration. The modification is in accordance with the terms of the contract." (*Busch v. Globe Industries* (1962) 200 Cal.App.2d 315, 320 [19 Cal.Rptr. 441].)

Here, substantial evidence supports the fact that the additional coverage Western provided to the Majors over and above the original policy limits were not "courtesy benefits," but increased coverage limits Western was contractually bound to pay under the terms of the insurance policy. As discussed in the Factual and Procedural Background, *ante,* the policy Western issued to the Majors was an "extended replacement cost" policy. For such a policy, Western required that the coverage limits for the dwelling (coverage A) be equal to the cost to replace the dwelling at the time the policy was issued.

Because of this, Western required a physical inspection and appraisal of the house be generated. However, the inspection did not occur until after the Majors' policy issued and the original policy limits were set. The inspection report identified the replacement cost of the Majors' home to be $235,578, approximately $43,000 more than the original policy limits. Because of this,

according to Dare, Western required the policy be "reformed" to state the correct amount of coverage. However, it was not changed until December 2004, after the Majors retained counsel. Thereafter, three weeks after the Majors filed suit, Western sent the Majors a letter stating the policy limits had been raised. In that letter, Dare stated that because the coverage limits had been raised, "[t]here may be additional benefits *owed* to the Majors . . . ." (Italics added.)

From this evidence the trial court and jury could conclude the policy had been modified by Western to comply with the original terms of the policy, and thus no new consideration was necessary to support the modification. In such a situation, "there is no alteration. The modification is in accordance with the terms of the contract." (*Busch v. Globe Industries, supra,* 200 Cal.App.2d at p. 320.)

Western asserts that the Majors have forfeited the right to claim the contract was modified because they never made such an assertion below, only stating a claim for *reformation* on the theory they were not responsible for selecting the policy limits, i.e., they were underinsured. Because the court granted nonsuit on that reformation claim, Western argues they cannot rely on such a remedy to support their damages under the increased policy limits. This contention is also unavailing.

After Western increased the coverage for their house, the Majors submitted a second claim that Elsa Major testified exceeded $30,000. Counsel for the Majors argued at trial that the contract had been "reformed" to reflect the new policy limits. Similarly, counsel for Western conceded at trial the contractual coverage limits were raised. As discussed above, Dare, the adjuster on the policy, confirmed the policy limits were raised. She admitted that the Majors were contractually entitled to the increased coverage limits. Moreover, in its motion for nonsuit, Western did not contend the Majors had failed to adequately plead or prove a modification of the policy, but only (1) the agreement to increase policy limits was gratuitous, and (2) there was insufficient evidence the Majors had suffered the personal property damages sought. The court denied that motion. Thus, Western conceded at trial that the contract had been modified to reflect the true coverage for the Majors' house, including additional amounts for personal property that were never paid. If this issue has been forfeited on appeal, it is Western that has forfeited it, as Western never claimed at trial that the Majors had failed to properly plead or prove the contract was modified.

Moreover, had Western asserted such a claim, it would have failed. First, in their complaint the Majors *did* plead a duty on the part of Western to increase policy limits to the match the value of the dwelling. Specifically, the Majors

alleged, "The Policy further included an endorsement for Extended Cost Coverage—125%, which increased the limits of liability for Coverages A, B, C and D to 125% of the limits shown in the Declarations Page. The Extended Replacement Cost Coverage—125% was provided to plaintiffs only if they allowed defendant Western to adjust the Coverage A limit of liability and premium in accordance with 'property evaluations [Western] makes and any increases in inflation.' In other words, in order to qualify for the endorsement, Western required plaintiffs to ensure their dwelling for its full replacement cost as determined by Western at the time the Policy issued . . . ." Second, if the Majors did not plead the modification specifically enough in their complaint it is because the modification letter was not sent until *after* the Majors filed their complaint. Third, in their opposition to Western's motion for summary judgment in the case, the Majors claimed the policy was belatedly revised to reflect the inspection report's valuation of the Majors' dwelling. Thus, Western cannot claim it was not on notice of the Majors' theory the contract was modified to increase policy limits.

Western also asserts there can be no bad faith cause of action based upon "a promise independent of the insurance policy." However, as explained, *ante*, these benefits were not "courtesy benefits" independent of the policy, but increases in coverage dictated by the terms of the policy itself.

Further, the cases cited by Western in support of this proposition do not assist its position. *CalFarm Ins. Co. v. Krusiewicz* (2005) 131 Cal.App.4th 273, 286 [31 Cal.Rptr.3d 619] held that because a claim of promissory estoppel was a promise "independent of the Policy's implied covenant of good faith and fair dealing," it could not support a claim for punitive damages. *R & B Auto Center, Inc. v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327, 354 [44 Cal.Rptr.3d 426] held that because there was no potential for coverage at the time the claim was made, where the insurer later unilaterally reformed the contract to provide coverage, there could be no bad faith for the insurer's "failing to have the foresight to know that the policy would be reformed." Here, by contrast, the policy itself provided for the coverage in the amount to which Western later increased it. It was part of the contractual bargain of the parties, and, based upon the inspection report, provided for the increased coverage at the time the Majors made their claim. Western's failure to modify the contract to reflect the correct coverage limits until the Majors filed suit cannot shield it from tort liability.

## 2. *Substantial evidence supports the amount of the economic damages award*

Western argues alternatively that if the increased policy benefits were not "courtesy benefits," but increased coverage under the policy, there is no substantial evidence supporting the jury's award of $31,359.55. We reject this contention.

Elsa Major testified at trial that she submitted a second claim for personal property (coverage C) benefits that exceeded $30,000. Exhibit 455, a computer printout generated by Western, showed that $31,359.55 was remaining on the increased personal property coverage at the time of trial. Dare stated at trial that if the Majors proved they suffered that amount in personal property damages, Western would be required to pay that money. At trial she did not contend there was no evidence to support $31,359.55 in personal property damages, only that the receipts were illegible because they had been faxed and did not cross-reference the original inventory. Dare testified that, even at trial, the money would be paid if the Majors submitted an "inventory explaining what their receipts are for."

However, Dare admitted on redirect that the receipts were not faxed but mailed. Moreover, with the Majors' first claim for personal property benefits, Western did not require the Majors to match receipts to their inventory, and there is no such requirement in the insurance policy. Thus, substantial evidence supports the jury's award of economic damages.

## II. *THE NONECONOMIC DAMAGES AWARD IS NOT EXCESSIVE*

### A. *Standard of Review*

"The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear the witnesses and frequently . . . see the injury and the impairment that has resulted therefrom. . . . The power of the appellate court differs materially from that of the trial court in passing on this question. An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506–507 [15 Cal.Rptr. 161, 364 P.2d 337].)

If the award appears excessive as a matter of law, however, the reviewing court has a duty to act in order to correct the injustice. (*Cunningham v. Simpson* (1969) 1 Cal.3d 301, 308–309 [81 Cal.Rptr. 855, 461 P.2d 39].)

B. *Analysis*

██ "The substance of a bad faith action . . . is the insurer's unreasonable refusal to pay benefits under the policy," and in such an action "damages for emotional distress are compensable as *incidental damages flowing from the initial breach*, not as a separate cause of action . . . ." (*Gourley v. State Farm Mut. Auto. Ins. Co.* (1991) 53 Cal.3d 121, 127–128 [3 Cal.Rptr.2d 666, 822 P.2d 374], some italics added (*Gourley*).) Such claims of emotional distress must be incidental to " 'a substantial invasion of property interests.' " (*Id.* at p. 128.)

Thus, emotional distress damages must be tied to actual, not merely potential, economic loss. (*Continental Ins. Co. v. Superior Court* (1995) 37 Cal.App.4th 69, 85–86 [43 Cal.Rptr.2d 374] ["In the absence of any economic loss there is no invasion of [the insureds'] property rights to which their alleged emotional distress over [the insurer's] denial and delay could be incidentally attached. In short, there would be no legal basis for an action for bad faith."]; *Waters, supra*, 41 Cal.App.4th at p. 1078 ["[A]ctual (not merely potential) financial loss must be established before an insured can recover emotional distress damages in a bad faith case"]; *Blake v. Aetna Life Ins. Co.* (1979) 99 Cal.App.3d 901, 925 [160 Cal.Rptr. 528] (*Blake*) ["In the customary 'bad faith' case, the essence of the plaintiff's emotional distress is the anxiety arising from the financial deprivation traceable directly to nonpayment of the claim."].)

Further, while unreasonable delay in paying benefits is actionable as bad faith, "a delay in paying policy benefits, even if in an unreasonable manner, does not in itself establish economic loss to the plaintiff" so as to justify emotional distress damages. (*Maxwell v. Fire Ins. Exchange* (1998) 60 Cal.App.4th 1446, 1450 [70 Cal.Rptr.2d 866].) On the other hand, the requirement of economic loss for recovery of emotional distress damages may be satisfied where the insured has paid legal fees and court costs to enforce his or her claim under the policy. (*Delos v. Farmers Group, Inc.* (1979) 93 Cal.App.3d 642, 659 [155 Cal.Rptr. 843].)

Following oral argument we requested further briefing from the parties as to whether the Majors, once they had made a threshold showing they suffered some economic harm, could recover emotional distress damages not related solely to that harm but for all the bad faith actions of Western, regardless of whether those actions caused economic loss. We conclude that in determining whether the emotional distress damages award will withstand scrutiny, we may only consider the actual damages the jury awarded the Majors, including the attorney fees award, as those are the only items of economic loss actually

suffered. The delayed payment of benefits, standing alone, without resulting economic damages, is insufficient to support an award of emotional distress damages.

In *Gourley, supra*, 53 Cal.3d at page 128, our Supreme Court held that a plaintiff may recover damages for mental distress only "as long as such damages were *proximately caused* by his insurer's breach of the implied covenant." (Italics added.) It is this financial loss that "defines the cause of action." (*Id.* at p. 129.) Stated another way, " '[b]reach of the implied covenant of good faith is actionable because such conduct causes financial loss to the insured, and *it is the financial loss or risk of financial loss* which defines the cause of action. Mental distress is compensable as *an aggravation of the financial damages, not as a separate cause of action.*' " (*Ibid.*, italics added, quoting *Richardson v. Allstate Ins. Co.* (1981) 117 Cal.App.3d 8, 13 [172 Cal.Rptr. 423].)

Thus, there is a proximate cause requirement for recovery of emotional distress damages in bad faith actions. As explained by the Court of Appeal in *Blake, supra*, 99 Cal.App.3d at page 925, "In the customary 'bad faith' case, the essence of the plaintiff's emotional distress is the anxiety arising from the financial deprivation traceable directly to nonpayment of the claim." (Citing *Silberg v. California Life Ins. Co.* (1974) 11 Cal.3d 452 [113 Cal.Rptr. 711, 521 P.2d 1103].)

In support of their contention that once they make a threshold showing of some loss, they need not show further damages arising from a delay in paying their claim, the Majors rely on *Clayton v. United Services Automobile Assn.* (1997) 54 Cal.App.4th 1158, 1161 [63 Cal.Rptr.2d 419], which held that " '[o]nce economic loss is shown . . . the plaintiff is entitled to recover for all emotional distress proximately caused by the insurer's bad faith without proving any causal link between the emotional distress and the financial loss.' " The *Clayton* court cites as support for this proposition *Waters, supra*, 41 Cal.App.4th 1063. However, *Waters* does not support the holding in *Clayton*. Rather, after reviewing Supreme Court precedent, the Court of Appeal in *Waters* acknowledged that in bad faith cases "we are concerned with mental distress *resulting from* a substantial invasion of property interests of the insured . . . ." (*Waters, supra*, 41 Cal.App.4th at p. 1073, italics added.) Discussing the *Gourley* decision, the Court of Appeal interpreted it to hold that "in allowing an insured to recover emotional distress damages *flowing from* an insurer's breach . . . , the court [in *Gourley*] 'recognized that the bad faith action is not a suit for personal injury but rather "relates to financial damage." ' " (*Waters, supra*, 41 Cal.App.4th at p. 1076, italics added.)

Courts have stated that plaintiffs need to make a "threshold" showing of some financial loss in order to recover emotional distress damages at all.

However, once that threshold is met, the *amount* of emotional distress damages is still tied to the amount of economic damages. This is because, as discussed above, in the insurance bad faith setting, emotional distress is not recoverable as a separate cause of action, but only as " 'an aggravation of the financial damages' " (*Gourley, supra,* 53 Cal.3d at p. 129).

■ In determining whether the noneconomic damages award is excessive, we compare the amount of that award to the economic damages award, to see if there is a reasonable relationship between the two. Further, in looking at the amount of the economic damages award, we consider not only the policy benefits recovered, but also the *Brandt* fees awarded by the jury, as they are an economic loss proximately caused by an insurer's tortious refusal to pay benefits under the policy. (*Brandt, supra,* 37 Cal.3d at p. 817.) When the total economic damages award of $220,359.55 is compared to the noneconomic damages award of $450,000, we have only a two-to-one ratio. Thus, it bears a reasonable relationship to the economic harm the Majors suffered, and the award is not excessive.

### III. *THE COURT DID NOT ERR IN INSTRUCTING THE JURY ON EMOTIONAL DISTRESS*

Western asserts the emotional distress award must be reversed completely because the court erred in its jury instructions on emotional distress in that it refused to instruct the jury that it was not responsible for the Majors' inadequate policy limits. This contention is unavailing.

#### A. *Background*

The Majors sought at trial to reform the contract, arguing Western was obligated to pay the full cost to rebuild their residence, which they testified would cost $444,178. Finding no legal support for this position, the court granted Western's motion for nonsuit on this claim.

Western thereafter sought to have the jury instructed that (1) it was not responsible for the Majors' inadequate policy limits; (2) it was not liable for the negligence, if any, of the Majors' insurance broker in failing to adequately cover the Majors; and (3) Western did not promise to provide 100 percent replacement coverage for the dwelling. The court in turn suggested that the parties agree to an instruction it drafted that stated, "The jury is not to consider whether or not the insurance was sufficient to completely replace the Majors' home."

The court told the parties if they did not agree with the instruction, they could work together to come up with an alternative and present it to the

court. Western did not do so. Instead, it agreed to a modified version of that instruction, called "Special Instruction No. 2," which stated: "Even though there has been evidence on the subject, based on the rulings made by the Court, the jury is not to consider whether or not the insurance limits were sufficient to completely replace the Majors' home."

In closing argument, counsel for Western reiterated this instruction to the jury, stating: "Whether the limits were sufficient to rebuild that same house, although we have evidence that they were, that's not an issue any longer."

## B. *Applicable Standards*

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 [34 Cal.Rptr.2d 607, 882 P.2d 298].) However, instructional error in a civil case is not grounds for reversal unless it is probable the error prejudicially affected the verdict. (*Id.* at p. 580.) In determining whether instructional error was prejudicial, a reviewing court must evaluate "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Id.* at pp. 580–581, fn. omitted.)

"Instructions should state rules of law in general terms and should not be calculated to amount to an argument to the jury in the guise of a statement of law. [Citations.] Moreover, it is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly prominent although the instruction may be a legal proposition. [Citations.]" (*Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 718 [39 Cal.Rptr. 64].) Finally, "[e]rror cannot be predicated on the trial court's refusal to give a requested instruction if the subject matter is substantially covered by the instructions given. [Citations.]" (*Id.* at p. 719; see *Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 335 [145 Cal.Rptr. 47].)

## C. *Analysis*

Western's claim of instructional error is unavailing because Special Instruction No. 2 adequately informed the jury they were not to consider whether the policy limits were sufficient to replace the Majors' dwelling. Western's three proposed instructions were duplicative of the instruction, which adequately covered that issue. Indeed, by proposing three instructions on the issue, Western unduly emphasized the issue.

Moreover, Western cannot show that any error in the court's refusal to give its proposed instructions resulted in prejudice. As discussed, *ante*, there is substantial evidence the Majors suffered significant emotional distress and that it was caused by Western's delayed payment of benefits and its refusal to pay amounts clearly covered under the policy. Further, there is no claim that any of the other instructions given to the jury expressly or impliedly told the jury Western was obligated to pay the full replacement cost of the Majors' home.

Nor did counsel for the Majors argue the "underinsurance" issue in closing arguments, as Western asserts. Rather, counsel properly argued Western had an obligation to increase policy limits once it discovered the inspection report indicated a higher replacement cost than the coverage. The jury did not request a rereading of the instructions and there is no other evidence it was misled or confused. In sum, there is "no reasonable probability that the [alleged] error . . . affected the jury's verdict." (*Soule v. General Motors Corp., supra*, 8 Cal.4th at pp. 582–583.)

## IV. *SUBSTANTIAL EVIDENCE SUPPORTS THE ATTORNEY FEES AWARD*

Western asserts the jury erred in awarding attorney fees because counsel for the Majors were compensated for work they performed after the full policy limits were paid. (See *Brandt, supra*, 37 Cal.3d at p. 819.) However, this contention is unavailing because, as we have discussed, *ante*, the insurance contract was modified by Dare's letter on February 23, 2004, and the Majors did not receive the full amount of their personal property damages until the jury's verdict in December 2006.

Moreover, contrary to Western's assertion, counsel for the Majors testified in detail about the amount of fees the Majors incurred. He testified that he reviewed the entire file, carefully allocated the time devoted to the prosecution of the complaint against Western, broke out the time devoted to the contract portion of the complaint, and the time that could not be segregated. He identified and requested hourly billing rates lower than the rates a court had awarded in a recent insurance bad faith case, and stated he had not billed for at least 200 hours in trial preparation and for the trial itself. He also described the costs incurred in connection with the action and reduced that amount by nearly half to account for those costs attributable to the prosecution of the contract action only. Substantial evidence supports the jury's award of attorney fees.

## V. SUBSTANTIAL EVIDENCE SUPPORTS THE MAJORS' ENTITLEMENT TO PUNITIVE DAMAGES

Western asserts there is no substantial evidence to support the punitive damages award because there is no evidence a managing agent committed the allegedly oppressive acts. We reject this contention.

Civil Code section 3294, subdivision (b) provides, "[a]n employer shall not be liable for [punitive] damages . . . based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, *or managing agent* of the corporation." (Italics added.)

In *Egan, supra,* 24 Cal.3d 809, the California Supreme Court held punitive damages could be awarded against an insurance company based on tortious acts of its claims representatives. In doing so it rejected the insurance company's claim that the employees were not " 'managerial employees' " engaged in " 'high-level policy making.' " (*Id.* at p. 822.) The high court held that "[t]he determination whether employees act in a managerial capacity . . . does not necessarily hinge on their 'level' in the corporate hierarchy. Rather, the critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy. When employees dispose of insureds' claims with little if any supervision, they possess sufficient discretion for the law to impute their actions concerning those claims to the corporation." (*Id.* at pp. 822–823.)

In so holding, *Egan* cited with approval language from Justice Tamura's concurring and dissenting opinion in *Merlo v. Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 5, 25 [130 Cal.Rptr. 416]: " 'It must be remembered that we are here concerned with an insurance company . . . , not just any corporation. Manifestly, to plaintiff, [the claims representative's] actions were actions of defendant. [The claims representative] personally managed the most crucial aspects of his employer's relationship with its policyholders. Defendant should not be allowed to insulate itself from liability by giving an employee a nonmanagerial title and relegating to him crucial policy decisions.' " (*Egan, supra,* 24 Cal.3d at p. 823.) Accordingly, *Egan* concluded there was substantial evidence to support the jury's decision to assess punitive damages. (*Id.* at p. 821.)

In *Hale v. Farmers Ins. Exch.* (1974) 42 Cal.App.3d 681 [117 Cal.Rptr. 146], disapproved on another ground in *Egan, supra,* 24 Cal.3d at page 822, footnote 5, the high court concluded there was substantial evidence to support an inference by the jury that the insurance company either authorized or ratified the acts of its Santa Ana branch claims supervisor, who had full authority to decide whether payment on a claim should be authorized or withheld. (*Hale, supra,* at pp. 691–692.)

In *Textron Financial Corp. v. National Union Fire Ins. Co.* (2004) 118 Cal.App.4th 1061, 1080–1081 [13 Cal.Rptr.3d 586] (*Textron*), the Court of Appeal held that a third party insurance agency was a managing agent of an insurer where the company could independently solicit, bind, write and administer liability insurance policies; it participated in issuing the policy to the insured, cancelling it, and reinstating it; advised the insurer's claims adjuster to deny the claim; and participated in the ultimate decision to deny the claim.

Western does not assert that because Cambridge was a separate entity and Dare and the other claims adjusters were not employees of Western, they were not Western's agents. In fact, Western concedes that they were agents for purposes of respondeat superior tort liability for compensatory damages. However, Western asserts that Dare and the other claims adjusters at Cambridge were not *managing* agents for purposes of punitive damages. This contention is unavailing as substantial evidence shows that under the foregoing authority the jury could find that Dare was the managing agent of Western.

Western retained Cambridge to handle a significant aspect of Western's business: its claims handling functions. There was no day-to-day oversight of Dare's claims handling functions. Dare was Cambridge's regional manager/supervisor/claims adjuster. She managed 35 employees in an office in Minnesota that handled claims as far away as California, oversaw the claims operation, supervised lower ranking supervisors, trained adjusters, worked on the budget, supervised the handling of certain files, and authorized payment of benefits.

Most important for our managing agent analysis, Dare personally assumed the claims handling of the Majors' claim after Anderson left. She exercised substantial discretionary authority to pay or not pay benefits owing to the Majors. In fact, she made the decision to refuse to pay the benefits ultimately awarded by the jury on the basis, later proven untrue, that the receipts were illegible because they were faxed.

These facts are sufficient for the jury to find she was a managing agent. As we stated, *ante,* "the critical inquiry is the degree of discretion the employees

possess in making decisions that will ultimately determine corporate policy. When employees dispose of insureds' claims with little if any supervision, they possess sufficient discretion for the law to impute their actions concerning those claims to the corporation." (*Egan, supra*, 24 Cal.3d at pp. 822–823.)

Western asserts the standard enunciated in *Egan* is no longer applicable because it predated the enactment of Civil Code section 3294 and, in particular, the 1980 amendments that contained the "managing agent" limitation on corporate responsibility for punitive damages. In actuality, in *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563 [88 Cal.Rptr.2d 19, 981 P.2d 944] (*White*), the court concluded the 1980 amendments to section 3294 did *not* alter *Egan*'s definition of managing agent as "those employees who exercise substantial independent authority and judgment over decisions that ultimately determine corporate policy." (*White, supra*, at p. 573.) As *White* explained: "[I]n amending [Civil Code] section 3294, subdivision (b), the Legislature intended that principal liability for punitive damages not depend on employees' managerial level, but on the extent to which they exercise substantial discretionary authority over decisions that ultimately determine corporate policy. Thus, supervisors who have broad discretionary powers and exercise substantial discretionary authority in the corporation could be managing agents. Conversely, supervisors who have no discretionary authority over decisions that ultimately determine corporate policy would not be considered managing agents even though they may have the ability to hire or fire other employees. In order to demonstrate that an employee is a true managing agent under [Civil Code] section 3294, subdivision (b), a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business." (*White, supra*, at pp. 576–577.)

As *White* has held, claims managers that exercise substantial discretionary authority to pay or deny claims exercise "substantial discretionary authority over decisions that ultimately determine corporate policy." (*White, supra*, 21 Cal.4th at p. 577.) Substantial evidence thus supports the jury's determination that Dare was a managing agent of Western, and thus Western was responsible for her actions in handling the Majors' claim.

### VI. *THE AMOUNT OF THE PUNITIVE DAMAGES AWARD IS NOT EXCESSIVE*

Western asserts that if the compensatory damages award is reduced, we must remand this matter for a new trial on punitive damages. The Majors argue that if the compensatory damages award is reduced, we should decrease the amount of the punitive damages award instead of sending this matter back

for a new trial. As we have concluded the noneconomic damages award is not excessive, and we have declined to reduce the amount of that award, the ratio of punitive damages, when compared to the tort damages awarded in this case, is not excessive.

### A. Standard of Review

■ "In deciding whether an award of punitive damages is constitutionally excessive . . . we are to review the award de novo, making an independent assessment of the reprehensibility of the defendant's conduct, the relationship between the award and the harm done to the plaintiff, and the relationship between the award and civil penalties authorized for comparable conduct. [Citations.] This '[e]xacting appellate review' is intended to ensure punitive damages are the product of the ' " 'application of law, rather than a decision-maker's caprice.' " ' [Citation.] [¶] On the other hand, findings of historical fact made in the trial court are still entitled to the ordinary measure of appellate deference." (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172 [29 Cal.Rptr.3d 379, 113 P.3d 63], fn. omitted (*Simon*).)

"To state a particular level beyond which punitive damages in a given case would be grossly excessive, and hence unconstitutionally arbitrary, ' "is not an enviable task. . . . In the last analysis, an appellate panel, convinced it must reduce an award of punitive damages, must rely on its combined experience and judgment." ' [Citation.]" (*Simon, supra,* 35 Cal.4th at p. 1188.) Moreover, our "constitutional mission is only to find a level higher than which a award *may not* go; it is not to find the 'right' level in the court's own view." (*Ibid.*)

### B. Analysis

■ The United States Supreme Court has determined that the due process clause of the Fourteenth Amendment to the United States Constitution places limits on state courts' awards of punitive damages, limits appellate courts are required to enforce in their review of jury awards. (*State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408, 416–418 [155 L.Ed.2d 585, 123 S.Ct. 1513] (*State Farm*).) The imposition of "grossly excessive or arbitrary" (*id.* at p. 416) awards is constitutionally prohibited, for due process entitles a tortfeasor to " 'fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.' " (*Id.* at p. 417.)

The United States Supreme Court and the California Supreme Court have stated that there are three factors to consider in determining whether the amount of a punitive damages award passes constitutional muster: "(1) the

degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury" and comparable civil penalties where available. (*State Farm, supra,* 538 U.S. at p. 418; see *Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191, 1201 [29 Cal.Rptr.3d 401, 113 P.3d 82].) We discuss these factors in order.

### 1. *Reprehensibility of Western's conduct*

Courts utilize five factors to help determine the degree of reprehensibility of a defendant's conduct: (1) whether the harm was physical and not merely economic; (2) whether the conduct demonstrated an indifference or reckless disregard for the health or safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct was repeated or an isolated incident; and (5) whether the conduct was the result of intentional acts or mere accident. (*State Farm, supra,* 538 U.S. at p. 419; *Simon, supra,* 35 Cal.4th at p. 1180.) Further, the reprehensibility of a defendant's conduct is the most important indicator of the reasonableness of a punitive damages award. (*State Farm, supra,* 538 U.S. at pp. 418–419; *Simon, supra,* 35 Cal.4th at p. 1180.)

Here, the harm was purely economic as there were no personal injuries suffered by the Majors. This factor thus supports a relatively low award of punitive damages. The second factor also favors Western, as there is no allegation Western's claims handling was in conscious disregard of the Majors' health or safety. There is also no contention that the actions of Western's claims adjusters were repeated against other insureds, as opposed to just the Majors.

However, the Majors were financially vulnerable as a result of their house burning down, a fact known to Western. This fact supports a substantial punitive damages award.

The last factor, whether the conduct was the result of intentional conduct or mere accident, "is of little value in assessing a California punitive damages award, as accidentally harmful conduct cannot provide the basis for punitive damages under our law. At a minimum, California law requires conduct done with 'willful and conscious disregard of the rights or safety of others' or despicable conduct done 'in conscious disregard' of a person's rights." (*Simon, supra,* 35 Cal.4th at p. 1181.) The jury's finding that Western acted with oppression demonstrates Western's actions were intentional.

### 2. *Ratio of punitive damages to compensatory award*

Although the United States Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical

formula" (*BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 582 [134 L.Ed.2d 809, 116 S.Ct. 1589]), the high court has concluded that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." (*State Farm, supra,* 538 U.S. at p. 425.) The high court "also explained that past decisions and statutory penalties approving ratios of 3 or 4 to 1 were 'instructive' as to the due process norm, and that while relatively high ratios could be justified when ' "a particularly egregious act has resulted in only a small amount of economic damages" [citation] . . . [t]he converse is also true . . . . When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.' " (*Simon, supra,* 35 Cal.4th at p. 1182.)

Our high court has interpreted this language from *State Farm* to mean that it established a "type of presumption: ratios between the punitive damages award and the plaintiff's actual or potential compensatory damages significantly greater than 9 or 10 to 1 are suspect and, absent special justification (by, for example, extreme reprehensibility or unusually small, hard-to-detect or hard-to-measure compensatory damages), cannot survive appellate scrutiny under the due process clause." (*Simon, supra,* 35 Cal.4th at p. 1182, fn. omitted.)

 Further, because punitive damages are not authorized in contract actions under California law, where both contract and tort damages are awarded in insurance bad faith cases only the *tort* damages are considered in measuring the proportionality of a punitive damages award. (*Textron, supra,* 118 Cal.App.4th at p. 1084.) As the court in *Textron* stated: "[T]he proportionality of the punitive damages to compensatory damages must focus on the amount awarded for breach of the implied covenant of good faith and fair dealing and for fraud . . . excluding the sum plaintiff recovered on the contract claim . . . ." (*Ibid.*; accord, *Diamond Woodworks, Inc. v. Argonaut Ins. Co.* (2003) 109 Cal.App.4th 1020, 1056, fn. 35 [135 Cal.Rptr.2d 736], disagreed with on other grounds in *Simon, supra,* 35 Cal.4th at pp. 1182–1183.) The *Textron* court reasoned that, because punitive damages cannot be awarded for a breach of contract, contract damages are irrelevant to, and must be excluded from, the analysis of the ratio guidepost. (*Textron, supra,* 118 Cal.App.4th at p. 1084.)

Moreover, as we stated, *ante, Brandt* fees are considered extracontractual *tort* damages that compensate a plaintiff for an insurer's bad faith refusal to pay policy benefits. (*Brandt, supra,* 37 Cal.3d at pp. 817–818.) Accordingly, the amount of the jury's award of *Brandt* fees in this case may be properly considered, along with the emotional distress damages award, in determining if the ratio of punitive damages to the tort damages award is excessive.

Here, the punitive damages award of $646,471.53 is slightly more than a one-to-one ratio to the tort damages awarded by the jury ($450,000 in emotional distress damages + $189,000 in *Brandt* fees = $639,000). This is a reasonable ratio that does not raise due process concerns under *State Farm, supra,* 538 U.S. 408.

### 3. *Comparable civil penalties*

In California, as in Utah (see *State Farm, supra,* 538 U.S. at p. 428), the most analogous civil penalty for the conduct in this case would be a fine of $10,000. (Ins. Code, § 790.03, subd. (h)(1), (5).) Thus, this last factor supports a relatively low punitive damages award as well.

We conclude, based upon the record in this case, our application of the foregoing factors, and our collective experience, the punitive damages award in this matter that is roughly equal to the tort damages award is reasonable and does not exceed a level that would make it constitutionally infirm. (*Simon, supra,* 35 Cal.4th at p. 1188.) Accordingly, we affirm the jury's punitive damages award.

### VII. *THE JURY VERDICT ON PUNITIVE DAMAGES WAS NOT INCONSISTENT*

Western asserts the jury's punitive damages verdict as a whole must be reversed because it is inconsistent as they jury found Western did not act with malice, but did act with oppression. This contention is unavailing.

Civil Code section 3294, subdivision (c) defines the terms "malice," "oppression," and "fraud" for purposes of punitive damages liability: "(1) 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a *willful and conscious disregard* of the rights or safety of others. [¶] (2) 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in *conscious disregard* of that person's rights. [¶] (3) 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (Italics added.)

In order for a jury to award punitive damages, it need only find that the defendant acted with malice, oppression *or* fraud (Civ. Code, § 3294, subd. (a); *Pistorius v. Prudential Insurance Co.* (1981) 123 Cal.App.3d 541, 556, fn. 8 [176 Cal.Rptr. 660] ["Civil Code section 3294 provides for

recovery of exemplary damages for *either* or all of the three defined delicts—oppression, fraud or malice."]).

Moreover, as seen by the definitions quoted above, the jury need not find Western acted with malice to find it acted oppressively. Malice requires a finding that Western acted with both a "conscious" and "willful" disregard for the rights of others. The statutory definition of oppression instead only requires a "conscious" disregard for the rights of others.

## DISPOSITION

The judgment is affirmed. The Majors shall recover their costs on appeal.

Benke, Acting P. J., and Haller, J., concurred.

A petition for a rehearing was denied January 30, 2009, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied April 22, 2009, S170546. Corrigan, J., did not participate therein.