Filed 6/27/13  ClearLight Partners v. Code Hennessy & Simmons CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| CLEARLIGHT PARTNERS II, LLC et al., | |
| Plaintiffs and Appellants, | G047226 |
| v. | (Super. Ct. No. 30-2010-00366771) |
| CODE HENNESSY & SIMMONS, LLC et al., | O P I N I O N |
| Defendants and Respondents. | |


Appeal from a judgment of the Superior Court of Orange County, Franz E. Miller, Judge.  Affirmed.

Howarth & Smith, Don Howarth and Jessica Rankin for Plaintiffs and Appellants.

Gibson, Dunn & Crutcher, Daniel M. Kolkey, Douglas M. Fuchs, Aaron H. Bloom and Kristopher P. Diulio for Defendant and Respondent, PricewaterhouseCoopers.

Sidley Austin, Bradley H. Ellis, Jodi E. Lopez, Anand Singh and David M. Schiffman for Defendant and Respondent, Code Hennessy & Simmons.

## INTRODUCTION

ClearLight Partners II, LLC, and Gold Canyon Mining and Construction, LLC, appeal from a judgment dismissing their case after the trial court granted summary judgment to Code Hennessy & Simmons, LLC (CHS), and PricewaterhouseCoopers, LLC (PwC). ClearLight and Gold Canyon alleged in their second amended complaint that CHS and PwC misled them as to the accuracy of financial statements prepared for the sale of a division of American Asphalt and Grading Company (AAG), a company in which CHS owned a majority interest. CHS put AAG's mining services division up for sale in 2007 to raise money to pay off AAG's lenders, and ClearLight created and funded Gold Canyon to buy this division as a stand-alone company. After errors in the financial statements come to light post-sale, appellants sued CHS and PwC for negligent and intentional misrepresentation and for unjust enrichment.

We affirm the judgment. Appellants did not present evidence to establish a triable issue of fact as to PwC's intent to induce reliance, a subject dealt with at length in our Supreme Court's opinion in *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370 (*Bily*). And they failed to present evidence to establish a triable issue of fact as to CHS's reasonable belief in the accuracy of the financial information presented to it by AAG and PwC. Without such evidence, summary judgment was properly granted.

## FACTS

According to the operative second amended complaint, AAG was a company with multiple divisions, one of which provided infrastructure (e.g., roads and sewer lines) for the Las Vegas housing construction market. CHS owned a majority interest in AAG, and two of its members sat on AAG's board. As the Las Vegas housing market crumbled, CHS decided to restructure AAG, which was in default to its lenders, by selling one of its divisions, the mining services division. In March 2007, Lincoln International, Inc., an investment bank, came on board to assist CHS.

2

CHS ultimately selected ClearLight[1] as the sole party to negotiate for AAG's mining services division and signed a letter of intent with ClearLight in December 2007. ClearLight retained experts in various fields to advise it on the acquisition, among them the Deloitte & Touche accounting firm.[2]

Before the due diligence process got off the ground, however, ClearLight and AAG entered into a Confidentiality Agreement, in June 2007. In the agreement, ClearLight acknowledged that "neither [AAG] nor any of [AAG's] affiliates or representatives makes any representation or warranty as to the accuracy or completeness of the Information.[3] [ClearLight] agrees that neither [AAG] nor its affiliates or representatives shall have any liability to [ClearLight] or to any of [ClearLight's] representatives as a result of the use of the Information by [ClearLight] and [ClearLight's] representatives, it being understood that only those particular representations and warranties which may be made to the purchaser in a definitive agreement, when, as and if it is executed, and subject to such limitations and restrictions as may be specified in such definitive agreement, shall have any legal effect."

Because ClearLight was buying a division, and not the entire company, the division's financial performance had to be determined independently of that of the other divisions constituting AAG. Accordingly, CHS and AAG brought in PwC to assist in preparing special "carve-out" financial statements.

PwC's engagement letter defined the nature of its engagement and placed restrictions on what could be done with the results: "The Services [PwC] will perform

---

[1] The complaint alleged that both CHS and Clearlight were private equity firms engaged in buying and selling businesses.

[2] Deloitte billed ClearLight $300,000 for its financial due diligence services on the AAG acquisition.

[3] The Confidentiality Agreement defined "Information" as "[a]ll information, irrespective of the form of communication, ascertained by or furnished to [ClearLight] or [ClearLight's] representatives, including, without limitation, [ClearLight's] attorneys, accountants, consultants, lenders and financial advisors (collectively, 'representatives'), by [AAG] or any of [AAG's] respective representatives, and all analyses, compilations, data, studies or other documents prepared by [ClearLight] or [ClearLight's] representatives containing or based in whole or in part on any such furnished information or reflecting [ClearLight's] review of, or interest in, [AAG]."

will include . . . holding discussions with certain officers, employees, and outside consultants of [the mining division], performing financial analyses of the historical results and trends of [the division] and performing certain other procedures which will follow those outlined in Exhibit 1.[4] [¶] Deliverables [¶] Our reporting to you will be primarily in the form of oral advice and may include various written outlines, executive summaries, presentations, memorandums, analysis of issues, schedules, etc., prepared to assist us in advising you on your divestiture. If requested, upon completion of the Services, we will provide you with a written report setting forth the significant matters that came to our attention . . . ." Notably, PwC was not engaged to create the carve-out financial statements or to audit either the mining services division or AAG.

PwC's engagement letter cautioned that PwC's work product was "solely for [the clients'] use and benefit. Except as stated elsewhere in this letter, [CHS and AAG] may not distribute the Deliverables or discuss or disclose the Services to any third party [,] and the Deliverables, whether in draft or final form or portions thereof, including our oral comments, should neither be associated with the financial statements of [the mining division] nor should they be referred to or quoted, in whole or in part, in any . . . document, without our express written consent. . . . [¶] . . . [¶] In the event that the Deliverables are to be distributed to another party or if [CHS and AAG] request that we participate in discussions with another party relating to the Services, an Access Letter must be received from that party prior to the distribution or discussion. The terms of the Access Letter are to be determined exclusively by PwC. [¶] The Deliverables will not be prepared or written from a buyer's perspective and the Deliverables are not intended to be shared with potential buyers. Accordingly, any branded Deliverables bearing a reference

---

4       Exhibit 1 identified the scope of PwC's work as, in broad terms, helping management to identify people and equipment to be included in the sale; reviewing mining contracts; analyzing equipment, analyzing overhead and selling, general, and administrative expenses; preparing a quality of earnings analysis for fiscal years 2005 and 2006; understanding the transactions between the mining division and the other AAG divisions; understanding management's carve-out assumptions for assets and liabilities, receivables, working capital, and capital expenditure; and analyzing management's forecast for fiscal year 2007.

to PricewaterhouseCoopers, PwC or PwC's branding and name may not be shared with any potential buyers. [¶] The restrictions on use of Deliverables . . . shall not apply to unbranded Deliverables where [CHS and AGG] have first carefully considered the contents of such Deliverables and have adopted them as [their] own, redacted any and all reference to PricewaterhouseCoopers, PwC, or PwC's branding and name from such Deliverables prior to any such disclosure, distribution, or discussion and presented such Deliverables solely as [their] own work product with no attribution or references to any form to PwC."

The carve-out financial statements consisted of balance sheets for the mining services division for the end of each month between December 2007 and April 2008 and income statements for year 2007, for the first quarter of 2008, and for each month between January and April 2008. These financial statements were prepared by the management of AAG and of the mining services division between December 2007 and April 2008.

Representatives of Lincoln, AAG, PwC, and CHS met each month to discuss each statement before releasing it to ClearLight. After the discussions, the Lincoln representative would ask everyone present if the information in the statements was correct. Upon receiving the confirmation from everyone present, Lincoln would send the financial statements to ClearLight. Financial statements for the 12 months ending December 31, 2007, for the month of January 2008, for the two months ending February 29, 2008, and for the three months ending March 31, 2008, along with balance sheets for December 2007 and January, February, and March 2008 were attached to the final asset purchase agreement.

ClearLight set up and funded Gold Canyon as the entity to buy the mining division from AAG. The asset purchase agreement between AAG (seller) and Gold Canyon (buyer) included a section on the financial statements in the representations and warranties of the seller: "Except as set forth on Schedule 4.4(a), the Financial Statements

have been prepared in accordance with [Generally Accepted Accounting Principles], consistently applied, except that they are subject to year-end audit adjustments and lack footnotes. The Financial Statements present fairly, in all material respects, the financial position of the Mining Services Business as of the date thereof and the results of operations of the Mining Services Business for the period covered thereby." AAG's vice president in charge of the mining services division certified the financial statements as "true and current" and the representations and warranties as "true and correct." The sale of AAG's mining services division to Gold Canyon closed on June 10, 2008.

Everyone agrees the financial statements included at least one error.[5] The cost of the diesel fuel consumed by the mining division in 2007 and during the first part of 2008 was substantially underreported. Apparently this error was masked while the mining services division was part of AAG, because of the way fuel costs as a whole were handled in AAG's accounting. Soon after the division started operating as a stand-alone company (as Gold Canyon) and the fuel bills started to come in, the error was discovered.

ClearLight and Gold Canyon sued CHS and PwC for negligent and intentional misrepresentation and for unjust enrichment. ClearLight alleged that both CHS and PwC represented to ClearLight that they had reviewed the financials and that the statements were accurate, when they were actually false. CHS and PwC moved for summary judgment, which the trial court granted. The court ruled that ClearLight had not presented sufficient evidence to create a triable issue of fact as to defendants' knowledge of falsehood and their intent to induce reliance. Judgment was entered on June 4, 2012.

---

[5] The second amended complaint alleged error in general terms. In the summary judgment motions the parties focused on the particular error involving diesel fuel costs. Evidently additional problems were discovered after closing, and AAG and Gold Canyon participated in an arbitration relating to all of the warranty breaches in February 2010. The arbitrator awarded Gold Canyon $2.5 million, the asset purchase agreement having set this cap on damages for breaches of the warranties.

6

## DISCUSSION

**I.** **Summary Judgment**

We review a trial court's decision to grant summary judgment de novo. (*Reliance Nat. Indemnity Co. v. General Star Indemnity Co.* (1999) 72 Cal.App.4th 1063, 1074.) Code of Civil Procedure section 437c, subdivision (a), permits a party to move for summary judgment on the ground that the action has no merit. A defendant moving for summary judgment has met its burden of showing that a cause of action has no merit if it has shown that one or more elements of the cause of action cannot be established. (Code Civ. Proc. § 437c, subd. (p)(2).) Once the moving defendant has met that burden, the burden shifts to the plaintiff to show that a triable issue of material fact exists. (*Ibid.*)

"[T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries the burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . . A burden of production entails only the presentation of 'evidence.' ( Evid. Code, § 110.) . . . A prima facie showing is one that is sufficient to support the position of the party in question." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850-851.)

**II.** **Negligent Misrepresentation**

The elements of a cause of action for negligent misrepresentation are (1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage. (*Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 983.) Unlike fraud, negligent misrepresentation does not require knowledge of falsity. A defendant who makes false statements "'honestly believing that they are true, but without

7

reasonable ground for such belief, . . . may be liable for negligent misrepresentation . . . .' [Citations.]" (*Bily, supra,* 3 Cal.4th at pp. 407-408.)

**III.        Intentional Misrepresentation**

The elements of a cause of action for intentional misrepresentation are a knowingly false representation of a material fact, an intent to induce reliance, justifiable reliance by the plaintiff, and resulting damages. (*Service by Medallion, Inc. v. Clorox Co.* (1996) 44 Cal.App.4th 1807, 1816.) Failure to establish a triable issue of fact as to one of these elements supports a motion for summary judgment. (See *Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1255-1256.)

In its oppositions to respondents' motions for summary judgment, ClearLight asserted that CHS and PwC were at least reckless in their representations regarding the mining services division's fuel expenses. (See *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 974 (*Engalla*); see also *Continental Airlines, Inc. v. McDonnell Douglas Corp.* (1989) 216 Cal.App.3d 388, 428 (*Continental Airlines*).) Representations made "recklessly and without regard for their truth" are the equivalent of intentional misrepresentations. (*Engalla, supra,* 15 Cal.4th at p. 974.)

The difference between "no reasonable ground for belief," the standard for negligent misrepresentation, and "reckless disregard of the truth" is not easy to articulate. In *Engalla*, for example, the court found that Kaiser entered into its arbitration agreements with "a reckless indifference" as to whether its agents would try to comply with the contractual timelines. (*Engalla, supra,* 15 Cal.4th at p. 974.) This indifference could, however, also be characterized as a lack of any reasonable ground for believing that the timelines would be met. The false statement in the *Continental Airlines* case – that the landing gear of the DC-10 aircraft would break off in an emergency without rupturing the wing fuel tanks (when the feature had not yet been designed) (*Continental Airlines, supra,* 216 Cal.App.3d at p. 423) – could be either reckless indifference or lack

8

of any reasonable ground.[6]  Perhaps reckless disregard of the truth can be exemplified by the German prison camp guard Sergeant Shultz, of the venerable television series, who routinely squeezed his eyes shut and muttered, "I know nothing.  I see nothing," even as American prisoners-of-war were violating camp rules all around him.  (But see *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz* (1976) 57 Cal.App.3d 104, 111 [doubt as to status of partnership evidence of lack of reasonable ground].)

ClearLight also accused CHS and PwC in the trial court of making intentionally false statements of fact, because they knew the fuel prices were stated as average or standard prices instead of the actual price per gallon of the fuel.  In its brief to this court, however, ClearLight appears to have settled on knowing falsehood as the basis for its intentional fraud claim.

IV.          **PwC's Motion for Summary Judgment**[7]

PwC moved for summary judgment on the two fraud claims alleged against it, negligent and intentional misrepresentation.  The trial court's ruling cited two elements of the causes of action for which ClearLight could not produce evidence of a triable issue of fact.  We need not address both of them.  (See *Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 393.)  The trial court correctly found that there was no triable issue of fact as to PwC's intent to induce reliance.  This finding alone is sufficient to defeat both the negligent and intentional misrepresentation causes of action against PwC.  (See

---

[6]          If the McDonnell sales representatives touting this feature knew it did not exist, the statements would be intentionally false.  (*Id.* at p. 428.)

[7]          A discouraging number of references to the record in PwC's and CHS's briefs are to their statements of undisputed facts.  A reference to a statement of facts, "without citing where in the record we can find the evidence supporting the facts asserted," is not a proper citation to the record.  "The separate statement is not evidence of anything.  It is mere assertion.  The evidence of the asserted facts appears elsewhere – in affidavits, deposition, etc.  [The] brief should have cited to those pages in addition to the separate statement . . . ."  (*Stockinger v. Feather River Community College* (2003) 111 Cal.App.4th 1014, 1024-1025; see also 2 Eisenberg et al., Cal. Practice Guide:  Civil Appeals and Writs (The Rutter Group 2012) ¶ 9:36,  p. 9-13).)  We have disregarded the facts in the briefs unaccompanied by proper citations.  (See *Stockinger v. Feather River Community College, supra,* 111 Cal.App.4th at p. 1025.)  In addition, when the record consists of multiple volumes of appendix or transcripts (clerk's or reporter's), it is helpful to cite to the volume number of the transcript in addition to the page number, e.g., 23 AA 6659.

*Mariani v. Price Waterhouse* (1999) 70 Cal.App.4th 685, 707-708 [negligent misrepresentation]; *B.L.M. v. Sabo & Deitsch* (1997) 55 Cal.App.4th 823, 835 [same]; *Textron Financial Corp. v. National Union Fire Ins. Co.* (2004) 118 Cal.App.4th 1061, 1073 [intentional fraud].)

It is important to zero in on the misrepresentation PwC is alleged to have made to ClearLight. PwC did not prepare the financial statements themselves. The statements were prepared by AAG and, at closing, warranted and certified by an AAG vice president.[8] There is no evidence of any written materials representing the mining services division's financial condition between December 2007 and June 2008 prepared by PwC and given directly to ClearLight. The basis for the misrepresentation claims is an oral representation, "The financial statements are accurate," purportedly made during the due diligence period.

There is no evidence that anyone from PwC ever made such a representation to anyone at ClearLight. ClearLight bases its claims mainly on representations made to it in conversations with and e-mails from *Lincoln* that PwC was "reviewing" or "signing off" on the financial statements as they were being prepared at the end of 2007 and the first part of 2008, before the sale closed in June 2008.[9]

In *Bily*, the California Supreme Court set out the requirements for the intent element in a negligent misrepresentation claim against accountants by non-clients. "'The representation must have been made with the intent to induce plaintiff . . . to act in reliance on the representation in a specific transaction . . . that defendant intended to influence. Defendant is deemed to have intended to influence [its client's] transaction

---

[8] See *Bily, supra,* 3 Cal.4th at page 399: "As a matter of commercial reality, audits are performed in a client-controlled environment. The client typically prepares the financial statements; it has direct control over and assumes primary responsibility for their contents. [Citation.]"

[9] ClearLight also referred to two documents, a December 2007 draft power point presentation and a June 2008 fairness opinion by Lincoln to AAG – both of which mention PwC – as evidence of "regular" distribution of PwC's work product. ClearLight has provided no evidence that it ever saw either one of these documents before the sale closed.

with plaintiff whenever defendant knows with substantial certainty that plaintiff . . . will rely on the representation in the course of the transaction. If others become aware of the representation and act upon it, there is no liability even though defendant should reasonably have foreseen such a possibility.'" (*Bily, supra,* 3 Cal.4th at p. 414.) The court also disposed of ClearLight's argument that such intent is always a question of fact: "[W]e do not suggest that the question of intent to benefit a third party will inevitably involve a question of fact." (*Ibid.*)

PwC's engagement letter expressly prohibited sharing information with anyone outside the seller's group without PwC's written authorization and specifically warned that its work product was not intended to be shared with potential buyers. Any information or written work shown to outside parties without PwC's written authorization (and a signed access letter) had to be adopted by CHS or AAG as their own and all references to PwC removed.[10] In addition, both of the PwC accountants working on the sale stated in declarations that they did not intend to communicate PwC's work product to ClearLight or intend ClearLight to rely on PwC's work. They also declared they never authorized Lincoln to make any representations on PwC's behalf as to the accuracy of the carve-out financial statements. On at least one occasion, in October 2007, PwC reminded Lincoln that its work was for internal discussion only.

As stated above, ClearLight hangs its causes of action for misrepresentation on assertions by Lincoln that PwC "reviewed" or "signed off" on the financial statements as they were being prepared and distributed to ClearLight between December 2007 and June 2008. This approval, according to ClearLight, creates a triable issue of fact as to PwC's intent to induce ClearLight's reliance on the financial statements.

---

[10] The senior member of ClearLight's negotiating team stated that never in his experience in private equity firms had accountants issued an oral opinion regarding financial statements or an indirect oral representation regarding financial statements.

11

Even assuming that Lincoln informed ClearLight that PwC was "reviewing" and "signing off" on the financial statements as they were being prepared by AAG, this evidence could not establish PwC's intent to induce ClearLight's reliance on any PwC oral or written work product. ClearLight presented no evidence that PwC authorized Lincoln to make any representations on its behalf regarding the accuracy of the financial statements or that PwC even knew what Lincoln was telling ClearLight.[11] The only positive evidence it presented was a deposition testimony from one of the *CHS* representatives involved in the sale that *he* could not recall any restrictions placed on what Lincoln could communicate to ClearLight and that he would have expected Lincoln to communicate what it thought was actually happening with regard to the financial review process on the seller side. This is insufficient to show *PwC's* intent.[12]

The California Supreme Court has restricted negligent misrepresentation liability to non-clients to cases in which an accountant "'manifests an intent to supply the information for the sort of use in which plaintiff's loss occurs.'" (*Bily, supra,* 3 Cal.4th at p. 409, quoting Rest.2d Torts, § 522, com. (a), italics omitted.) "The 'intent to benefit' language of the Restatement Second of Torts thus creates an objective standard that looks to the specific circumstances (e.g., the supplier-client engagement letter and the supplier's communications with the third party) to ascertain whether the supplier has undertaken to inform and guide a third party with respect to an identified transaction or type of transaction." (*Id.* at p. 410, italics omitted.)

---

[11] ClearLight attempts to overcome this obstacle by reference to the rule that a false statement can be passed from one person to another and relied on to the other person's damage. (See 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 804, p. 1159.) The rule applies, however, only when the person making the statement intends to have it transmitted or reasonably should conclude that there is an especial likelihood that it will be transmitted. (See *Geernaert v. Mitchell* (1995) 31 Cal.App.4th 601, 605, 607.) ClearLight presented no evidence that PwC intended Lincoln to endorse the financial statements in PwC's name or had any reason to imagine a special likelihood it would do so. In any event, an "indirect communication" such as ClearLight proposes would, in the case of accountants, seem incompatible with the structure our Supreme Court so carefully set up in *Bily*.

[12] ClearLight also referred to deposition testimony from one of the PwC accountants: "Q. Did you ever tell anybody at Lincoln there were certain things they couldn't tell ClearLight? [¶] A. No." This does not translate into authorization by PwC to tell ClearLight that PwC was vouching for the accuracy of the financial statements.

12

None of the evidence presented by ClearLight in opposition to PwC's motion creates a triable issue of fact as to PwC's intent to inform and guide ClearLight with respect to the mining services division sale or to supply ClearLight with an independent endorsement of the financial statements.[13] PwC was not engaged to audit the mining services division, and ClearLight knew this. The fact that Lincoln may have made statements to ClearLight does not establish PwC's intent to induce reliance – at least not without some indication that PwC authorized Lincoln to make statements on its behalf. ClearLight had no such evidence.

Intent to induce reliance is also a necessary element of an intentional misrepresentation claim. (*Textron Financial Corp. v. National Union Fire Ins. Co., supra,* 118 Cal.App.4th at p. 1073.) The lack of evidence to create a triable issue of fact as to intent to induce reliance is fatal to this cause of action as well.

ClearLight's misrepresentation claims, if successful, would have two results. First, they would make PwC the guarantor of financial statements it did not prepare and did not audit and that ClearLight expressly agreed would be warranted by AAG alone. Second, they would provide ClearLight with two sets of accounting professionals working for it – Deloitte, to which it paid $300,000 for due diligence accounting, and PwC, to which it paid nothing.[14] PwC was working for CHS and AAG; no evidence suggests it made any representations it intended anyone but its own clients to rely upon. It appears to have done everything in its power to assure that its work product would *not* reach ClearLight. The trial court correctly granted PwC summary judgment on ClearLight's misrepresentation causes of action.

---

[13] One of the ClearLight representatives vaguely recalled meetings early in the due diligence process during which he learned that PwC was involved in the accounting process, but he could not remember anything specific about the conversations taking place. He also recalled approximately a dozen meetings and telephone calls with PwC representatives during the due diligence period, but ClearLight presented no evidence about the content of these meetings and calls.

[14] "[A buyer] might commission its own audit or investigation, thus establishing privity between itself and an auditor or investigator to whom it might look for protection." (*Bily, supra,* 3 Cal.4th at p. 403.)

**V.          CHS's Motion for Summary Judgment**

The trial court granted summary judgment to CHS in part because ClearLight did not present evidence to establish a triable issue of fact as to CHS's reasonable grounds for believing in the accuracy of the financial statements. Failure to establish a triable issue of fact as to this element of negligent misrepresentation is a proper basis for summary judgment. (See *Fox v. Pollack* (1986) 181 Cal.App.3d 954, 963 [attorney properly relied on information from clients].)

It is important to recognize what is not at issue. ClearLight presented no evidence whatsoever that CHS engaged in any improper or deceptive manipulation of the data received from AAG's management or that CHS knew the financial statements inaccurately portrayed the mining division's financial condition. The remaining issues are whether CHS endorsed the financial statements either with no reasonable grounds for believing them to be accurate or with reckless indifference as to their accuracy. For negligent misrepresentation purposes, then, the question becomes whether CHS had "no reasonable ground" for believing the financial statements AAG prepared were accurate.

The trial court correctly held that CHS had met its burden to establish a prima facie case that it had reasonable grounds for believing in the accuracy of the information supplied by AAG regarding fuel costs. It presented evidence that the financial statements were prepared by AAG's management and the management of the mining services division and that CHS had no information suggesting the statements were inaccurate. The head of the mining services division (now the head of Gold Canyon) thought the financial statements ultimately presented to ClearLight at the close of the deal were accurate, and he warranted them. It was his opinion that the errors in the fuel costs could not have been discovered before the June 2008 sale. AAG's chief financial officer believed the financial statements were accurate. The two PwC accountants believed the statements were accurate.

14

CHS having established a prima facie case for the reasonableness of accepting AAG's financial statements as accurate, the burden then shifted to ClearLight to present admissible evidence of a triable issue of fact as to this reasonableness. [15] (See Civ. Proc. Code § 437c, subd. (p)(2).) Was there a red flag or a bad odor about the data received from AAG that would have made CHS realize the information was unreliable?

ClearLight has focused on AAG's use of a "standard" or average price for the cost of fuel, rather than the actual price. But ClearLight presented no admissible evidence that CHS knew AAG was using a standard price for fuel instead of the actual one or that, if CHS had known about this feature of AAG's accounting, it should have set off any alarms.[16] Although it is undisputed that CHS did not conduct its own investigation into fuel costs, ClearLight has failed to present any evidence or authority to suggest CHS should have done so, instead of relying on two layers of financial professionals.[17]

Clearlight has also argued that "AAG was a company in financial trouble," and therefore CHS could not rely on it. This is a non sequitur. The fact a company is struggling financially does not compel a conclusion its accounting is unreliable. In fact, the opposite inference is just as likely – the financial difficulties are patent because the accounting is accurate. ClearLight asserted that CHS brought in PwC to assist because AAG was "thinly staffed," and thus, by inference, its financial reporting was unreliable.

---

[15] In presenting deposition testimony to support its motion, CHS ignores California Rules of Court, rule 3.1116(c), which requires a party to highlight the relevant portion of the transcript. The use of mini-script pages as exhibits violates rule 2.104 regarding type size.

[16] Recognizing this deficiency, ClearLight argues that PwC's knowledge about the fuel costs should be imputed to CHS because PwC was CHS's agent. Under ordinary circumstances, accountants are not agents of their clients. They do not represent the client in dealings with others, and they are not subject to the client's control in the performance of their duties – the two essential features of an agency relationship. (See Civ. Code § 2295; *Malloy v. Fong* (1951) 37 Cal.2d 356, 370.) ClearLight has presented no evidence of special facts in this case that would transform PwC into CHS's agent.

[17] In an October 2008 post-mortem, Deloitte opined that "additional testing/diligence or an audit most likely would **not** have caught the difference [between actual and reported fuel expenses]."

15

Even assuming the conclusion arises from the premise, this argument simply reinforces the reasonableness of CHS's belief that the financial statements were accurate – not only AAG but also PwC worked on them.

ClearLight has not raised a triable issue of fact as to whether CHS was entitled to accept AAG's financial statements as accurate. ClearLight therefore cannot establish an essential element of negligent misrepresentation, a representation made with no reasonable ground for believing it to be true. The court properly granted summary judgment on this cause of action.

And, as Clearlight cannot establish lack of reasonable ground for believing in the accuracy of AAG's financial statements, it cannot establish a higher level of culpability, recklessness or deliberate falsehood, which is needed for a cause of action for intentional misrepresentation. The court properly granted PwC's motion for summary judgment on this cause of action as well.

## VI.    Unjust Enrichment

"[T]here is no cause of action in California for unjust enrichment. 'The phrase "Unjust Enrichment" does not describe a theory of recovery, but an effect: the result of failure to make restitution under circumstances where it is equitable to do so.' [Citation.] Unjust enrichment is '"a general principle, underlying various legal doctrines and remedies,"' rather than a remedy itself. [Citation.] It is synonymous with restitution." (*Melchior v. New Line Productions, Inc.* (2003) 106 Cal.App.4th 779, 793; see also *Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 922 [unjust enrichment "depends upon a finding pursuant to some other cause of action" that charges were invalid or excessive].) The court properly granted summary judgment on this ground as well.

16

## DISPOSITION

The judgment is affirmed.  Respondents are to recover their costs on appeal.


BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


MOORE, J.